**Tracy SOLOMON, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY and Oxford Health Insurance Co., Defendants.**

**No. 06 Civ. 2375.**

United States District Court, S.D. New York.

June 18, 2009.

Koob & Magoolaghan, by Elizabeth L. Koob, Esq., Yonkers NY, for Plaintiff.

LESTER SCHWAB KATZ & DWYER, LLP, by Allan M. Marcus, Esq., New York, NY, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Metropolitan Life Insurance Company ("MetLife") and Oxford Health Plans, Inc. ("Oxford") (collectively, the "Defendants") have moved under Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint of plaintiff Tracy Solomon ("Solomon" or the "Plaintiff") and granting their cross counterclaim seeking recovery of benefits paid. Solomon has cross-moved under the same rule for summary judgment granting her the relief she has sought under the Oxford Employee Welfare Plan (the "Plan") and dismissing Defendants' counterclaim. Upon the findings and conclusions set forth below, Defendants' motion is denied, and the cross motion of Solomon for summary judgment on her claim is granted.

## I. Prior Proceedings

Solomon filed her complaint on March 27, 2006, seeking to compel MetLife to grant her benefits under the Plan.

Defendants filed their motion for summary judgment on March 18, 2008. Plaintiff's cross motion was filed on July 14, 2008. The motion and cross motion were marked fully submitted on August 20, 2008.

## II. The Facts

The facts have been set forth in the Defendants' Local Rule 56.1 Statement, the Plaintiff's Response, the Plaintiff's Local Rule 56.1 Statement, and the Defendants' Response and are not in dispute except as noted below.

Oxford established and maintains an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. The Plan provides long-term disability ("LTD") benefits to eligible employees.

MetLife is the Plan's claims administrator and also funds Plan benefits through a group policy of insurance. As Plan administrator, MetLife has "discretionary authority to interpret the Plan and determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan." Affidavit of Margaret A. Calderon ("Calderon Aff."), Exh. B, Summary Plan Description ("SPD") at 44.

To be eligible for LTD benefits, a participant must "require the regular care and attendance of a Doctor and [be] unable to perform each of the material duties of your regular job." Id., SPD at 21. After the first 24 months of LTD benefit payments, the definition of disability changes to mean the inability to perform the duties of "any gainful work or service for which you are

reasonably qualified taking into consideration your training, education, experience and past earnings." *Id.*

Under the Plan, a participant-claimant must provide documented proof of disability "satisfactory to [MetLife]." *Id.*, SPD at 33. As claims administrator, MetLife is responsible for initially reviewing claims and determining benefits eligibility. If a claim is denied, the participant may appeal to MetLife, which will render a final claim decision.

The Plan provides that monthly LTD benefits are reduced by "Other Income Benefits," including Social Security Disability Income ("SSDI") benefits. The Plan also provides that any overpayment of LTD benefits due to the retroactive receipt of Other Income Benefits shall be refunded to MetLife. If a claimant signs an agreement to repay MetLife any such overpayment, MetLife will not reduce monthly LTD benefits by an estimate of SSDI benefits.

Solomon, a registered nurse, was employed by Oxford as a medical claim case manager, which is a sedentary job. Solomon worked at Oxford until March 16, 1999, when she claimed to be disabled due to back pain following a fall.

Effective September 8, 1999, MetLife approved Plaintiff's LTD benefits claim. MetLife received medical information from Solomon's treating orthopedic surgeon, Dr. L. Starace ("Dr. Starace"), who diagnosed Solomon with lumbar radiculopathy and fibromyalgia, and from her treating rheumatologist, Dr. H. Paul Laskey ("Dr. Laskey"), and physical therapist, Gene Pavone ("Pavone").

Solomon signed an agreement to repay MetLife any overpayment of LTD benefits generated by receipt of SSDI benefits. MetLife assigned a Social Security specialist to work with Solomon to obtain SSDI benefits who reported that Solomon was a feasible candidate for SSDI benefits due to her multiple conditions.

In July 2000, MetLife also arranged for independent orthopedist Dr. Ralph Purcell ("Dr. Purcell") to examine Solomon. In an independent medical examination ("IME") report dated August 1, 2000, Dr. Purcell found no objective medical basis for any disability from an orthopedic standpoint. On the basis of the IME, MetLife terminated Solomon's benefits effective September 19, 2000, and Solomon appealed.

MetLife then had the claim file reviewed by an independent rheumatologist, Dr. J. Lieberman ("Dr. Lieberman"), who opined that Solomon's fibromyalgia was not disabling, but that more information should be obtained regarding a neurological diagnosis. Following discussion with Dr. S. Fromm ("Dr. Fromm"), Solomon's treating neurosurgeon, Dr. Lieberman stated that Solomon's neurological problems might be disabling and recommended a reassessment in three months.

By letter of January 26, 2001, MetLife notified Plaintiff that her LTD benefits were being reinstated.

Solomon then submitted a "Personal Profile" form to MetLife dated October 11, 2002, along with a handwritten addendum in which she set forth numerous restrictions on her daily living activities and general limitations "for varying amounts of time due to stiffness, pain and dizziness." Affidavit of Margaret A. Calderon ("Calderon Affidavit"), Exh. A, Claim File at 498–99. With respect to driving, Solomon answered "Yes" to the question "Do you drive?" explaining that:

It is difficult to sit and focus and concentrate to drive and I also get dizzy and have the feeling of moving when not in motion. I do not drive unless it is to the convenient [store] one-quarter mile from

my home. The doctors all have restricted driving. *Id.*, Claim File at 504. With respect to shopping, she stated, "I cannot shop as I cannot stand or walk any distance. I don't go unless I absolutely have to and then it is to the corner store," and further that, among other limitations, "I cannot sit or stand for longer than 5–15 minutes. I cannot lift anything over 3 or 4 pounds. I can't bend, twist, or stretch for things." *Id.*, Claim File at 499, 504.

On November 12–14, 2002, MetLife conducted surveillance of Solomon. A video and written report of the surveillance were prepared. The surveillance report notes that Solomon was able to drive to a medical appointment and to the grocery store, was able to lift and carry grocery bags, and was observed walking and bending with apparent discomfort and distress. The MetLife referral form for medical review characterizes the surveillance video in the Brief Summary of Claim as, "Compelling video from 11/2002 demonstrating EE's high level of functioning." *Id.*, Claim File at 650.

According to Plaintiff, the surveillance video shows her engaging in no activity on November 12, 2001, and less than ten minutes of activity carrying bags of groceries from her car approximately 20 steps to her first floor apartment on November 13, 2001. The surveillance report states that on November 14, 2001, Solomon drove her car 7–9 minutes to and from a doctor's office with no further activity observed for the day. According to Solomon, a whitepage.com search for the doctors who are reported to have offices in the building to which Solomon traveled informs that the address was 3 College Rd., Monsey, New York, not Rockland, New York, as stated in the report. Mapquest estimates that the drive from Solomon's home to the doctors' building takes 5 minutes to travel the 2.22 mile distance. This estimate is disputed by MetLife.

According to Solomon, there is no documentation in the diary notes or elsewhere in the claim file indicating that any claims administrator, reviewer, or medical consultant actually viewed or even requested to view the surveillance video. MetLife took no action against Solomon based upon the November 2002 surveillance until more than a year later when it referenced the report in the referral of the file to Dr. Amy Hopkins ("Dr. Hopkins") on January 8, 2004.

In July 2003, MetLife received a Notice of Disapproved Claim dated January 27, 2003, from the Social Security Administration ("SSA"). The SSA denied Solomon's claim for SSDI benefits, stating that it had "determined that [Solomon's] condition is not severe enough to keep [her] from working." *Id.*, Claim File at 447. Solomon's attorney notified MetLife of her request for a hearing on the denial.

On August 27, September 25, and November 25, 2003, MetLife requested updated medical records from Solomon. During the period from her application for LTD benefits on March 10, 1999, to the December 1, 2003 termination of benefits, MetLife requested updated medical information from Solomon or her doctors on 34 separate occasions.

By letter dated November 25, 2003, MetLife notified Solomon that, as no recent documentation had been submitted to support her disability claim, benefits would be terminated effective December 1, 2003. In December 2003 and January 2004, MetLife received various medical records from Solomon and her treating physicians. Among these were:

(i) Office notes of Dr. Fichman, a rheumatologist, describing the treatment for Solomon's fibromyalgia. Dr.

Fichman also described Solomon as "[n]eurologically ... grossly intact." *Id.* Claim File at 411, 427.

(ii) A March 20, 2003 report from Dr. Fromm describing his examination of Solomon. Dr. Fromm's diagnosis was peripheral polyneuropathy, with symptoms of decreased sensation in fingers and hands. He described Plaintiff's gait as normal and recommended MRIs of the spine and head to determine whether there were cerebral or spinal cord abnormalities. Dr. Fromm did not opine whether Solomon was unable to work. *Id.,* Claim File at 420.

(iii) October 10, 2003 MRI reports. The MRI of the brain was described as "normal." The cervical spine MRI revealed "mild degenerative disc disease at C4–6 with mild spondylosis and arthrosis .... There is no herniated disc or other epidural mass. There are no interdural masses. The spinal cord demonstrated normal signal intensity. The cranocervical junction is normal." *Id.,* Claim File at 422–23.

A MetLife diary note dated December 31, 2003, reports that Plaintiff was advised that all requested information was received.

MetLife then referred Solomon's file to Dr. Hopkins, Board-certified in internal and occupational medicine, for review. The MetLife referral form requesting a file review from Dr. Hopkins asks the following: "Based on most current medical, does documentation support a severely disabling medical condition that would render EE totally disabled from any occupation?" *Id.,* Claim File at 650. The second question on the form is "Does EE [employee] have, at a minimum, a sedentary to light work capacity?" *Id.*

Dr. Hopkins assessed each of Solomon's reported diagnoses and conditions and concluded that none of them was "objectively documented" to preclude Solomon from returning to work as of November 30, 2003. *Id.,* Claim File at 404. In particular, Dr. Hopkins noted that Solomon's gait and motion strength were found to be normal; that there was no evidence of radiculopathy, myopathy, plexopathy, disc herniation, spinal stenosis, cord compression or nerve root compression; that the video surveillance was inconsistent with Solomon's self-reported symptoms; and that there was no medical information about sleep disorders or a heart condition. MetLife sent Dr. Hopkins' report to treating physicians Drs. Fromm and Fichman for comments.

On January 14, 2004, MetLife again terminated Solomon's LTD benefits, and notified her of her right to appeal.

According to Solomon, on February 20, 2004, she sent a fax to MetLife contesting the denial of her claim, and included a neurosurgical narrative from Dr. Fromm stating that her disabling condition was permanent, and that the MetLife Appeal unit responded by letter dated March 2, 2004, stating that she must follow the review procedures to request a review of her claim denial. Solomon, through her attorney, filed an appeal on April 5, 2004.

MetLife received additional medical information from Solomon and her attorney including information from Dr. Susan Levine ("Dr. Levine"), an infectious disease specialist, who diagnosed Solomon with chronic fatigue syndrome ("CFS") and who opined that Solomon remained completely disabled from working.

Solomon's attorney, Aba Heiman ("Heiman") also submitted letters dated June 29, 2004, and July 16, 2004, enclosing medical reports and articles summarizing the medical information supporting Solomon's claim. Heiman further submitted an SSA

Notice of Decision dated July 28, 2004, awarding Solomon SSDI benefits.

MetLife sent the claim file to Dr. Joseph Jares ("Dr. Jares"), Board-certified in neurology, for evaluation of Solomon's functional capacities, and to Dr. Elinor Mody, Board-certified in rheumatology. Both of the reviewing doctors were retained through a corporation used by MetLife to find medical reviewers, Network Medical Review Company, Ltd. a/k/a Elite Physicians, Ltd. ("NMR" or "Elite"). In the year 2004, NMR and Elite received $838,265 or 11.57% of its gross income from arranging consultant reviews for MetLife. Dr. Jares prepared 603 consultant reviews for NMR in the year 2004, none of which involved examinations.

There is no referral form in the file for the two doctors who were asked to review the file at the appeal level. While neither doctor examined Plaintiff, both were asked to fill out a form estimating her physical capabilities based on their review.

In Dr. Jares' report dated September 3, 2004, he opined that, from a neurological standpoint, Solomon retained the functional capacity to work full time in a sedentary occupation. He stated:

> She has been repeatedly described as having intact neurological function with no evidence of weakness, atrophy, reflex loss or incontinence. Her MRI and EMG findings do not point to a process so severe that Ms. Solomon could not work in a sedentary position.

*Id.,* Claim File at 138. Dr. Jares further reported that Plaintiff's "history, physical examination, and testing support the presence of a chronic pain disorder, possibly fibromyalgia." *Id.,* Claim File at 137. While Dr. Jares concluded that "from a neurological standpoint" and Plaintiff "retains the ability to work full-time in a sedentary occupation," he conceded that his conclusion was without consideration of "[t]he diagnoses of fibromyalgia and chronic fatigue syndrome and [its] appropriate treatment," which required the expertise of a rheumatologist. *Id.,* Claim File at 139. Dr. Jares also stated that the diagnosis of peripheral neuropathy was not substantiated "primarily for technical reasons." Dr. Jares rejected the MRI evidence of degenerative disc disease because, allegedly, "similar findings may be seen in asymptomatic individuals." *Id.*

In her report dated September 3, 2004, Dr. Mody concluded that the medical documentation did not substantiate a decreased level of functionality that would preclude Solomon from working at a sedentary job. Dr. Mody reported "no medical data to substantiate decreased level of functionality" and stated that "there are no doctor's notes that record any synovitis or decreased range of motion or any abnormal physical finding other than tender points." *Id.,* Claim File at 144. She further stated that "almost everybody" meets the diagnostic criteria for fibromyalgia. *Id.,* Claim File at 145. Dr. Mody also relied on the surveillance video report, stating that "Ms. Solomon reported that in October 2002, she could not lift, could not do her grocery shopping for herself, and could not drive herself due to fatigability and decrease level of consciousness and ability to concentrate." *Id.,* Claim File at 144.

In a letter dated September 8, 2004, MetLife upheld its decision to terminate Solomon's benefits, stating that its determination was not based on the presence of certain diagnoses, "but rather on current functional limitations supported by recent objective clinical evidence that would substantiate symptoms consistent with those reported by the patient and medical providers." *Id.,* Claim File at 128. MetLife noted that the file had been reviewed by independent specialists in rheumatology and neurology who found that the objec-

tive medical information did not support a functional inability to work in a sedentary occupation.

MetLife's appeal denial letter makes no mention of Dr. Hopkins' report or the surveillance report, reasons which were given for the termination in MetLife's notice dated January 14, 2004. The appeal denial letter also gave no explanation as to why Solomon's medical evidence, which had been previously accepted by MetLife as satisfactory proof of disability, was now considered insufficient.

According to Solomon, MetLife has an inherent conflict of interest in making benefit determinations because as the payer of claims, the company profits financially the fewer claims it has to pay out. According to MetLife, the profitability of MetLife's group disability insurance business depends on many factors, including, *inter alia*, the amount of premiums it charges its policyholders and its costs of operation. MetLife case managers and appeals specialists receive as part of their compensation package stock options in the MetLife company. MetLife employees, at least at the appeal specialist level, receive annual bonuses, which are set company-wide and differ in percentage from year to year.

According to Solomon, she is due back benefits for the period of December 2003 to the present, in the sum of $72,511.60, with appropriate interest.

In July 2004, Solomon's claim for primary SSDI benefits was approved retroactive to a period of disability commencing March 25, 2001. MetLife trains its appeals specialists that they should give no weight to favorable decisions by the SSA. According to Plaintiff, the fact that she was found disabled by the Social Security Administration was not considered by the Appeals Specialist to be relevant to the appeal decision. Solomon received SSDI benefits of $1,348/month effective October 1, 2001.

Solomon's LTD monthly benefit from September 18, 1999, through November 30, 2003, was $2,642.85, which represented 60% of her pre-disability monthly earnings without any offsets. According to Met-Life, for the period October 1, 2001, through November 30, 2003, an overpayment of LTD benefits to Solomon of $29,738 was generated due to Solomon's retroactive receipt of SSDI benefits.

Plaintiff's attorneys petitioned for and were granted the sum of $10,125.00 for services rendered in representing Solomon before the Social Security Administration. This sum was deducted from Solomon's retroactive benefits and paid directly to her attorney. According to Solomon, Met-Life should have credited her for these fees approved by the SSA and deducted them from her retroactive payment as compensation for attorney services rendered in connection with the prosecution of her claim for SSDI benefits.

In addition, Solomon claims that Met-Life deducted from her September 2003 and October 2003 checks an estimated offset of $1,690.00 for anticipated SSDI benefits, and that any overpayment, at most, would be $21,543.00.

MetLife made no demand for the return of their alleged overpayment of benefits to Solomon before submitting its answer in this case.

## III.  Standards of Review

### a.  *The Summary Judgment Standard*

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Commc'ns, Inc.*

*v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For the purposes of summary judgment, "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law' . . . [and an] issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)). The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Where, like here, the parties have cross-moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Educ. of the City Sch. Dist. of the City of Olean*, 667 F.2d 305, 314 (2d Cir.1981).

In determining whether a genuine issue of material fact does exist, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir.2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir.1999) (quotation and citation omitted).

#### b. *The ERISA Standard of Review*

■ Review of an administrator's denial pursuant to an ERISA benefit plan is reviewed "under a *de novo* standard unless the plan provides to the contrary." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where, however, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the denial is reviewed for an abuse of discretion. *Id.*; *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir.2008) ("Where [discretionary] authority is given, the administrator's interpretation is reviewed for an abuse of discretion."); *see Suren v. Metropolitan Life Ins. Co.*, No. 07 Civ. 4439(JG)(RLM), 2008 WL 4104461 at *7 (E.D.N.Y. Aug. 29, 2008) (describing "arbitrary and capricious" and "abuse of discretion" standards as "interchangeably" used in this Circuit).

■ There is no dispute here that the Plan grants the "Plan administrator and other Plan fiduciaries" the "discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of the Plan." Calderon Aff., Exh. B, SPD at 44. The Plan fur-

ther states that "[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Id.* Nonetheless, Solomon argues that a *de novo* standard should apply because the decision to terminate her benefits was not made in accordance with the terms of the Plan as required to trigger the administrator's discretion.

As a fiduciary, MetLife is obligated to Plan participants to follow the written terms and conditions of the Plan in reviewing disability claims. *See* 29 U.S.C. § 1104(a)(1)(D). Solomon contends that MetLife violated the Plan terms by not continuing to pay benefits when there was no documented improvement in her medical condition between the time MetLife accepted her medical records as satisfactory proof of disability and the time her LTD benefits were denied. In light of the Plan terms which state that once written proof of a claim "is satisfactory to us," benefits will be paid and will continue to be paid until death, completion of the maximum benefit period, or "the date that [the individual] cease[s] to be Disabled," Solomon argues that the issue of whether an abuse of discretion or *de novo* standard of review applies turns on whether or not Solomon "ceased to be disabled."

MetLife is also required to pay benefits only to claimants that it determines are entitled to them under the terms of the Plan. *See* 29 U.S.C. § 1104(a)(1)(B). The initial approval of a claim, moreover, is not a guarantee of continuing eligibility of benefits. *See Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134(RJS), 2008 WL 169318, at *9 (citing with approval cases from outside Circuit holding that payment of benefits does not heighten proof required to terminate same); *Lee v. Aetna Life and Cas.*

*Ins. Co.*, No. 05 Civ. 2960(PAC), 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2007) ("[The administrator] is not required to disprove the possibility that [plaintiff] was disabled in order to terminate her benefits; rather, it is [plaintiff's] burden to demonstrate her disability under the Plan."); *see also Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir.2006) (describing plaintiff's burden of proving total disability).

The record here shows that Solomon's condition and the basis for her disability claim did not remain static during the four years that she received LTD benefits. Solomon's initial diagnosis was lumbar radiculopathy and fibromyalgia. After an independent examining orthopedist found no objective medical basis for disability, MetLife terminated Solomon's LTD benefits in July 2000. Based in part on the report of independent rheumatologist Dr. Lieberman, who concluded that while Solomon's fibromyalgia was not disabling, Plaintiff may suffer from neurological problems that would prevent her from working, MetLife reinstated Solomon's benefits. Then in 2004, after her benefits had again been terminated, Solomon submitted medical reports which included the diagnosis of CFS. Throughout this period, new evidence was also developed, including surveillance, MRI and EMGs records, the initial denial of Solomon's claim for SSDI benefits, and the evaluations of three independent physician consultants ("IPCs"). As Solomon's diagnoses changed, MetLife did not violate the terms of the Plan by requiring updated information and re-evaluating her entitlement to benefits.

In addition, none of the cases cited by Plaintiff support the application of *de novo* review on these facts. *See, e.g., Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 134–35 (2d Cir.2001) (finding "no dispute" regarding the application of a *de novo*

standard of review because the Plan did not grant discretion to the administrator); *Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir.2007) (applying heightened arbitrary and capricious standard prior to Supreme Court's opinion in *Metropolitan Life Ins. Co. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)). Accordingly, MetLife's denial of Solomon's LTD benefits will be reviewed under an arbitrary and capricious standard.

## IV. MetLife's Denial Was Arbitrary and Capricious

### a. *MetLife's Conflict of Interest Weighs Heavily Against Its Termination Decision*

■ Solomon contends that if a deferential standard of review is applied, the Court must heavily weigh MetLife's conflict of interest against its denial of benefits. It is undisputed that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948 (internal quotations and alteration omitted). In *Glenn*, the Supreme Court recognized that, "[o]ften the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Glenn*, 128 S.Ct. at 2346. Accordingly, the Court held:

> this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the

factor will depend upon the circumstances of the particular case. *Id.*

In analyzing the importance of such conflict, the Court provided guidance as to how much weight the conflict factor should be given within the arbitrary and capricious framework. The Court stated that the conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy ..." *Id.* at 2351. As an example, the Court explained that MetLife's policy of encouraging the plaintiff to apply for Social Security benefits, which offset plan benefits, and then disregarding the government's finding of disability, properly gave more weight to the conflict in the arbitrary and capricious analysis. *Id.* at 2352.

■ In this case, MetLife was both responsible for determining Solomon's claim and for paying any benefits due. The record contains no evidence that MetLife separated its financial interests from the claim determination process. There were, however, notations in Solomon's case file as to the reserve amount set on the claim, first at $100,000, with the notation that Plaintiff should apply for Social Security, and then later reset after the initial Social Security denial, to $275,000. In addition, as in *Glenn*, MetLife urged Plaintiff to apply for government benefits, but then disregarded the SSA's grant of benefits. Indeed the appeals specialist assigned to decide Solomon's appeal stated that she had been trained by MetLife to disregard SSA decisions, and that the decision was only relevant if MetLife was paying benefits and could use it for an offset.

Based on the foregoing, MetLife's conflict is a significant factor weighing against its denial that must be considered in the Court's arbitrary and capricious analysis.

### b. *MetLife's Denial Was Not Supported by Substantial Evidence*

An administrator's determination is arbitrary and capricious "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (quotation and citation omitted). " 'Substantial evidence' is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance.' " *Armstrong v. Liberty Mut. Life Assurance Co. of Boston*, 273 F.Supp.2d 395, 404 (S.D.N.Y.2003) (citing *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995)) (alteration in original). In addition, where the Plan administrators "impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir.1995) (alteration in original).

In its January 14, 2004 letter terminating Solomon's benefits, MetLife explained that its decision was based on the report of Dr. Hopkins, the surveillance reports, and a lack of supporting medical information. Solomon questions the reliability of Dr. Hopkins' report in light of the fact that she was employed on a regular basis by MetLife to review disability claims. Although MetLife describes Dr. Hopkins as an "independent reviewing physician," she derived 99% of her income in the years 2002–2004 from paper medical reviews for third parties, 58% to 63%, or over $100,000, of which was derived from reviews for MetLife. To the extent Dr. Hopkins relied on MetLife for over half of her income, she was not "independent" at the time she reviewed Solomon's file. In addition, with respect to MetLife's surveillance of Solomon in November 2002, the probative value of the surveillance tape is questionable given that MetLife failed to take any action to terminate benefits based on the tape until more than a year later when it was relied upon by Dr. Hopkins in her report.

Several courts have found evidence like that relied upon by MetLife to be less than substantial. For example, in *Soron v. Liberty Life Assurance Co. of Boston*, No. 5:02 Civ. 1514, 2005 WL 1173076 (N.D.N.Y. May 2, 2005), the district court found the decision denying benefits to a plaintiff who suffered from fibromyalgia unsupported by substantial evidence despite the insurer's reliance on the opinions of three reviewing doctors and a surveillance tape showing activity by the claimant. In other cases, courts have rejected surveillance tapes similar to the tape relied on here given their recording of daily activities unrelated to work. *See, e.g., Winter v. Hartford Life & Accident Ins. Co.*, 309 F.Supp.2d 409, 415 (E.D.N.Y.2004) (refusing to allow similar tapes, standing alone, to constitute substantial evidence to support the denial of LTD benefits in a back and neck injury case); *Chan v. Hartford Life Ins. Co.*, No. 02 Civ. 2943(LMM), 2004 WL 2002988, at *9 (S.D.N.Y. Sept. 8, 2004) (rejecting video of plaintiff walking, riding in a car, and shuffling papers as evidence of plaintiff's ability to work).

In denying Plaintiff's appeal of its initial termination, MetLife relied on the case file reviews of two "independent" physicians. Dr. Jares, the reviewing neurologist, re-

ported that Solomon had no disabling neurological conditions, but that the "history, physical examination, and testing support the presence of a chronic pain disorder, possibly fibromyalgia." Calderon Aff., Exh. A, Claim File at 137. Dr. Mody, a rheumatologist, submitted a brief report which relies in part on the surveillance video report from 2002. Dr. Mody found "no medical data to support a decreased level of functionality," and stated that although Solomon has fibromyalgia, "almost everybody" can meet the diagnostic criteria for the illness. *Id.*, Claim File at 145. Neither physician examined Solomon in person.

To the extent Drs. Hopkins and Mody based their findings on the view that fibromyalgia is not generally disabling, their conclusions do not constitute substantial evidence. The Court of Appeals for the Seventh Circuit specifically discredited such a general statement as evidence of disability in individual cases. *See Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 919 (7th Cir.2003) (describing "the fact that the majority of individuals suffering from fibromyalgia can work" as "the weakest possible evidence that [the claimant] can"). Relying on such statements as substantial evidence of non-disability is particularly troubling in the context of a diagnosis of fibromyalgia, "a disease that eludes [objective] measurement." *Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003) (recognizing fibromyalgia as potentially disabling in SSDI context); *see Rudzinski v. Metropolitan Life Ins. Co.*, No. 05 C 0474, 2007 WL 2746630 (N.D.Ill. Sept. 14, 2007) ("MetLife's insistence that Plaintiff provide documentation that she cannot possibly produce demonstrates both a fundamental misunderstanding of the disease and the unreasonableness of its determination.").

The final justification for MetLife's denial recounted in both its initial January 2004 letter and its letter denying Solomon's appeal dated September 8, 2004, is a lack of supporting "objective" medical information. According to Solomon, this justification is erroneous because the Plan contains no requirement of "objective medical documentation," because fibromyalgia cannot be easily proved through objective evidence, and because she provided MetLife sufficient "objective" evidence on which it could have based a finding of disability.

Although several courts in this District have rejected the argument that it is *prima facie* unreasonable for an administrator to base its denial on a lack of objective medical evidence of total disability where the Plan does not explicitly require such proof, such a requirement may in fact be unreasonable in the context of a particular case. *See e.g., Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504–05 (S.D.N.Y.2002) ("While plaintiff argues that the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that 'proof' of continued disability must be provided, and the very concept of proof connotes objectivity." (internal citation omitted)); *Fitzpatrick*, 2008 WL 169318, at *10 (listing cases where courts found objective medical evidence requirement not unreasonable). In light of Solomon's fibromyalgia and CFS diagnoses, symptoms of which have been described as "entirely subjective," *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996), and the 34 medical updates she provided MetLife, including numerous clinical examinations, laboratory reports, and various test results, Solomon furnished sufficient proof to establish total disability under the Plan. In upholding its decision to terminate on these grounds, this Court agrees with Solomon that MetLife abused its discretion, particularly in

view of its conflict of interest, discussed above.

### c. *Solomon Was Denied A Full And Fair Review*

■ MetLife's denial was also arbitrary and capricious in that it denied Solomon the opportunity for a full and fair review as required by section 1133 of ERISA. ERISA explicitly requires employee benefit plans to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The Department of Labor (the "DOL") has promulgated regulations that set forth the particular procedures administrators must undertake in order to comply with this provision. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials."). These regulations state that in order to comply with ERISA's mandate of a full and fair review, plans providing disability benefits must:

> Provide claimants the opportunity to provide written comments, documents, records, and other information relating to the claim for benefits ... [and] provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503–1(h)(2)(ii), (iv).

A fair review necessarily requires an opportunity to review and rebut the basis of the denial determination. *See Crocco v.*

*Xerox Corp.,* 137 F.3d 105, 108 (2d Cir. 1998) (affirming district court's judgment, based on *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813,* 715 F.2d 853 (3d Cir.1983), that "full and fair review" was not provided); *Grossmuller,* 715 F.2d at 857–58 (stating that full and fair review requires that claimant be presented with all relevant evidence and be afforded an opportunity to respond to that evidence); *see also, Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 974 (9th Cir.2006) (finding that "an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA" and that such a "procedural violation must be weighed by the district court in deciding whether [administrator] abused its discretion"). *But see, Midgett v. Wash. Group Int'l Long Term Disability Plan,* 561 F.3d 887, 895 (8th Cir.2009) (holding that "the full and fair review to which a claimant is entitled under 29 U.S.C. § 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal"); *Metzger v. UNUM Life Ins. Co. of Am.,* 476 F.3d 1161, 1166 (10th Cir.2007) ("Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal ... would set up an unnecessary cycle of submission, review, resubmission, and re-review."). Courts in this District have found that the requirement for a full and fair review continues beyond the initial determination into the appeal. *See Cohen v. Metropolitan Life Ins. Co.,* 485 F.Supp.2d 339, 353 (S.D.N.Y.2007) (finding that "MetLife's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious" because although "MetLife provided [claimant] and her at-

torney with copies of the administrative record as developed on the initial claim ... [its] failure to provide notice to Plaintiff of its consideration of materials in addition to those disclosed following its initial denial clearly deprived Plaintiff of the opportunity to submit comments and materials relevant to MetLife's determination"); *see also Anderson v. Sotheby's, Inc.*, No. 04 Civ. 8180(SAS), 2006 WL 1722576, at *18–19 (S.D.N.Y. June 22, 2006) (citing *Grossmuller* in support of full and fair review requirement); *Cejaj v. Bldg. Serv. 32B–J Health Fund*, No. 02 Civ. 6141(RMB)(MHD), 2004 WL 414834, at *8–9 (S.D.N.Y. Mar. 5, 2004) (same).

In its letter denying Solomon's appeal, MetLife specifically relied on the reports of Drs. Jares and Mody, reports that were not made available to Solomon until after the final decision was made. As a result, Solomon was not given the opportunity to respond to the statements made in those reviews that lead MetLife to the conclusion that she had failed to submit sufficient "objective clinical evidence to substantiate" her diagnoses. Accordingly, MetLife failed to comply with ERISA's "full and fair review mandate," further rendering its determination arbitrary and capricious. *See Cohen*, 485 F.Supp.2d at 353.

"Because district courts are required to limit their review to the administrative record, it follows that, if upon review a district court concludes that the [administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.' " *Miller*, 72 F.3d at 1071. Although Defendants argue the Court should remand the claim back to MetLife for reconsideration, on the existing administrative record, which includes substantial evidence of Solomon's multiple disabling conditions and the fact that her conditions do not lend themselves to objective testing, as well as evidence of a conflict inherent in MetLife's decision-making process, it would indeed be a useless formality to remand the case back to Met-Life.

## V. Factual Issues Preclude Summary Judgment on MetLife's Counterclaim

MetLife has counterclaimed for reimbursement for the alleged overpayment of LTD benefits during the period August 2001 through November 2003. Because Solomon was awarded retroactive SSDI benefits covering this period in July 2004, MetLife claims that it is entitled to assert as an offset against its own benefit liability totaling $29, 738.

ERISA empowers the plan fiduciary to obtain appropriate equitable relief to enforce the terms of the Plan. *See* 29 U.S.C. § 1132(a)(3)(B). MetLife seeks an order imposing a constructive trust on the amount of the benefit overpayment, or granting other equitable relief under a theory of unjust enrichment. "The Supreme Court has delineated what forms of equitable restitution are available under § 502(a)(3), distinguishing permissible forms of equitable restitution such as employment of a constructive trust or of an equitable lien from forms of legal restitution." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir.2005) (citing *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)). The Court has explained that "one feature of equitable restitution [is] that it [seeks] to impose a constructive trust or equitable lien on particular funds or property in the defendant's possession." *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356, 362, 126

S.Ct. 1869, 164 L.Ed.2d 612 (2006) (internal quotations omitted). There is, however, no strict tracing requirement for equitable liens by agreement. *Id.* at 365, 126 S.Ct. 1869.

Solomon argues that to maintain its equitable nature, MetLife's reimbursement claim must seek a specifically identifiable and non-dissipated overpayment fund, the specific contents of which are presumably long gone. The Plan terms, however, require Solomon to "promptly refund to [MetLife] an amount equal to all overpayments." Under *Sereboff,* the Plan fiduciary is entitled to relief in the form of a constructive trust on the overpayment *amount* specifically identified in the Plan, as distinct from Solomon's general assets. *See Sereboff,* 547 U.S. at 363–64, 126 S.Ct. 1869; *Kellner v. First Unum Life Ins. Co.,* 589 F.Supp.2d 291, 312–13 (S.D.N.Y.2008) (recognizing that "where the LTD plan includes an applicable offset provision, its fiduciaries may [ ] recover payments to beneficiaries that are later offset by a retroactive award of Social Security benefits"); *Unum Life Ins. Co. of Am. v. Lynch,* No. 04 Civ. 9007(CLB), 2006 WL 266562, at *3 (S.D.N.Y. Jan. 1, 2006) (holding that fact that defendant "may have commingled" overpayment funds with other money, "should not limit a Court of Equity from ordering equitable restitution" for overpaid benefits).

Solomon also contends that MetLife's counterclaim must be dismissed because it in effect seeks to impose a lien on Plaintiff's SSDI benefits which is not permitted under 42 U.S.C. § 407(a). *See Mote v. Aetna Life Ins. Co.,* 435 F.Supp.2d 827 (N.D.Ill.2006) (holding that 42 U.S.C. § 407 prevented carrier's counterclaim); *Ross v. Penn. Mfrs. Ass'n Ins. Co.,* No.

Civ. A. 1:05–0561, 2006 WL 1390446 (S.D.W.Va. May 22, 2006). Several other courts, however, have held that § 407(a)'s prohibition is not triggered by claims for reimbursement of overpayment. *See, e.g., Mattox v. Life Ins. Co. of N.A.,* 536 F.Supp.2d 1307, 1327 (N.D.Ga.2008); *Holmstrom v. Metropolitan Life Ins. Co.,* 615 F.Supp.2d 722, 753 (N.D.Ill.2009) (listing "vast majority of courts" that "have held that when a plan contains a 'lien by agreement' and the 'overpayment,' is caused by subsequent social security payments, Section 407 presents no bar to recovery"). Since MetLife's counterclaim asserts a property interest in its own overpayment of benefits rather than Solomon's social security benefits, § 407(a) does not require the Court to grant summary judgment for Solomon on Defendants' counterclaim at this time.[1]

In addition, there are disputed issues of material facts that preclude this Court from granting summary judgment for either party on Defendants' counterclaim at this time. Specifically, the parties disagree as to the amount of the claimed overpayment, the basis for MetLife's calculations, and the offsets to which Solomon may be entitled. Further, Solomon has asserted equitable defenses to the counterclaim which raise disputed issues of fact, including laches and unclean hands.

Under these circumstances, summary judgment on MetLife's counterclaim is inappropriate.

### Conclusion

Based on the facts and conclusions set forth above, MetLife's motion for summary judgment is denied and Solomon's

---

1. The Court is cognizant, however, that § 407(a) may prevent MetLife from imposing a lien on Solomon's current income to the extent that such income is derived solely from her benefits.

cross-motion for summary judgment is granted in part and denied in part.

It is so ordered.