James E. **MUGAN**, Plaintiff,

v.

**HARTFORD LIFE GROUP INSURANCE COMPANY,** Defendant.

**No. 09 CV 6711 (NRB).**

United States District Court, S.D. New York.

Jan. 20, 2011.

---

**112.** *See SEC v. Opulentica, LLC,* 479 F.Supp.2d 319, 331 (S.D.N.Y.2007).

**113.** SEC Mem. at 24.

Scott M. Riemer, Riemer & Associates, L.L.C., New York, NY, for Plaintiff.

Michael H. Bernstein, John T. Seybert, Sedgwick, Detert, Moran & Arnold, LLP, New York, NY, for Defendant.

1. This Court's review is limited to the record below. *See Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995). Accordingly, the factual background is derived from the administrative record, which is annexed as Exhibit A to the Declaration of Scott Riemer,

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Joseph Mugan ("Mugan") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., alleging that Hartford Life Group Insurance Company ("Hartford") wrongfully terminated his employer-sponsored long-term disability benefits. Before this Court is Mugan's motion for summary judgment, in which he argues that Hartford's decision to terminate his long-term disability benefits was arbitrary and capricious and that Hartford's decision was motivated by a conflict of interest. Also before this Court is Hartford's cross motion for summary judgment, requesting that the Court: (i) affirm Hartford's decision to terminate Mugan's long-term disability benefits; and (ii) grant Hartford's counterclaim seeking the repayment of benefits that it alleges Mugan wrongfully received.

For the reasons set forth below, Mugan's motion for summary judgment is denied, Hartford's motion for summary judgment on Mugan's claim is granted, and Hartford's motion for summary judgment on its counterclaim is granted in part as described herein.

## BACKGROUND

### I. Factual Background

#### A. The Disability Benefits Plan

Mugan began working for Cantor Fitzgerald as an equities trader in December 2001.(040).[1] At the time, Mugan was 34 years old. (040). While working for Can-

dated June 25, 2010, and which bears Bates numbers MUGAN 000001 through MUGAN 000632. Unless otherwise noted, the citations in this Memorandum and Order refer to the page(s) in the administrative record that bear Bates number(s) "MUGAN 000 ____."

tor Fitzgerald, Mugan was covered under a Group Long Term Disability Insurance Plan ("Plan"), which was administered by Hartford. (007–37). Pursuant to the Plan, Hartford has discretion to interpret the Plan's terms and to make eligibility determinations. (031).

To be eligible for disability benefits under the Plan, a claimant must satisfy either the "Occupation Qualifier" or the "Earnings Qualifier." (014). The Plan defines "Occupation Qualifier" as follows:

> Disability means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: (1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and (2) not Gainfully Employed.
>
> After the LTD Monthly Benefit has been payable for 24 months, Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: (1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and (2) not Gainfully Employed.

(014). In other words, for the first two years, Hartford evaluates a claimant's eligibility in light of the claimant's ability to perform the material duties of his or her specified job; thereafter, the inquiry broadens to consider whether the claimant can continuously engage in any job for which the claimant is or becomes qualified.

Alternatively, Hartford may evaluate disability under an "Earnings Qualifier." Under the Earnings Qualifier, "You may be considered Disabled … if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that

You are unable to earn more than 80% of Your Monthly Earnings in any occupation for which You are qualified by education, training or experience." (014).

A claimant who qualifies to receive benefits under either the Occupation or Earnings Qualifier will receive benefits on a monthly basis. (015). Monthly benefits are calculated in accordance with a formula that takes into account a number of factors, including the claimant's monthly earnings. (015). Additionally, under the formula, Hartford will reduce a claimant's monthly benefits to account for certain "Deductible Sources of Income," which include disability benefits paid under "[t]he Social Security Act, including any amounts for which Your dependents may qualify because of Your Disability." (015–16).

### B. Mugan's Heart Attack

On January 27, 2005, Mugan suffered a heart attack while traveling home on a train. (362–63). Following the heart attack, Mugan underwent multi-vessel bypass surgery and, on February 4, 2005, a cardiovascular surgeon implanted a cardiac defibrillator. (362–63). On March 9, 2005, a cardiologist named Dr. Gary Friedman began treating and monitoring Mugan's heart condition. (615).

Mugan returned to work in September 2005. (122). However, after returning to his job as an equities trader, Mugan began to experience increasingly frequent chest pain. (122). In January 2006, Dr. Friedman advised Mugan to stop working. (122). Two months later, Mugan took Dr. Friedman's advice and stopped working for Cantor Fitzgerald. (122).

### C. Mugan's Claims for Disability Benefits

In March 2006, Mugan submitted a claim for disability benefits. (538–39).[2] In

---

**2.** Mugan's initial claim was for short-term disability benefits, which Hartford adminis-

connection with his claim, Dr. Friedman documented his "objective findings" regarding Mugan's health, including that Mugan experienced: "unstable angina, ventricular tachycardia, post cardiac arrest mild encephalopathy & cognitive impairment." (538–39). Thereafter, Dr. Friedman periodically submitted documentation to Hartford, including so-called "attending physician statements," which Dr. Friedman prepared after Mugan's office visits. (*See, e.g.,* 598–601, 615–16).

In August 2006, Mugan filled out a Long Term Disability Income Benefits Questionnaire and other related documentation. (586–95). Included among the forms was a Long Term Disability Options and Reimbursement Agreement. That one-page agreement states:

> [t]he policy issued by [Hartford] provides that Long Term Disability (LTD) benefits will be reduced by the amount of any Other Income Benefits which you are eligible to receive.... We understand that you have applied for the Other Income Benefits shown below ... If your LTD benefits are calculated without a reduction for Other Income Benefits and those benefits are later awarded on a retroactive basis, a sizeable overpayment ... could result.

(595). In that agreement, Mugan elected to receive Plan benefits "with no reduction for estimated Other Income Benefits." (595). Mugan also checked the box stating that "I understand that this may result in an overpayment of my [long-term disability] benefits which I will be required to refund to The Hartford in a lump sum." (595). The agreement defined Other Income Benefits as "Social Security, Pension, Workers Compensation [,] etc." (595).

On September 12, 2006, Hartford approved Mugan's claim for long-term dis-

ability benefits. (166–69). In the claim approval letter, Hartford requested that Mugan update Hartford if he were granted social security disability benefits. (166). The letter reiterated that receiving social security disability benefits could result in an overpayment of Plan benefits. (167–68).

Four months later, in January 2007, Mugan received a letter from the Social Security Administration denying his claim. (571–74). According to the letter, the Social Security Administration denied Mugan's claim because he was "not disabled under our rules." (571–74). Mugan promptly sent the denial letter to Hartford. (113).

In the following months, Mugan continued to receive treatment from Dr. Friedman and from other physicians. (110–12). Specifically, in March 2007, Dr. Jeffrey Moses of Columbia University Medical Center performed an angioplasty on Mugan and implanted a stent. (111–12, 375–77). Shortly thereafter, Dr. Moses performed a second angioplasty on Mugan and implanted a second stent. (111–12, 380). Throughout the second half of 2007, Hartford and Mugan engaged in a continued dialogue about Mugan's condition. (108–11). In connection therewith, Dr. Friedman provided further information to Hartford about Mugan's medical condition. (108–11, 549–67).

In February 2008, Mugan advised Hartford that it had miscalculated his long-term disability benefits and that he had been underpaid by approximately $500 per month. (105–07). In response, Hartford contacted Cantor Fitzgerald and requested Mugan's salary information. (106). After receiving that information and recalculating the amount to which Mugan was entitled under the Plan's formula, Hartford

tered under a short-term disability plan. (174–86). Mugan was granted benefits under the

short-term disability plan and those benefits were exhausted in September 2006. (174).

agreed that it had miscalculated Mugan's benefits, and on March 3, 2008, Hartford advised Mugan that his benefits would be adjusted upward. (161–62, 505–43).

On March 7, 2008, Hartford informed Mugan that his claim was under investigation in connection with the disability test change, which would occur in September 2008.[3] (101). As requested, Mugan completed a claimant questionnaire, which included facts about his education, work history, and medical condition. (481–88). When addressing his health, Mugan noted that "since heart attack & seizures have [had] difficulty concentrating, perseverating & managing finances. Finances have now become stressful & induce chest pain." (484).

In connection with the upcoming test change, a Hartford Rehabilitation Specialist, Lisa Hufford ("Hufford"), analyzed whether Mugan would be able to perform "any occupation" at the time of the disability test change in September 2008. (94–95, 454–80). Hufford prepared a report ("Hufford Employability Report"), in which she noted that Mugan has the "ability to influence people, perform a variety of duties, perform under stress, influence others, serve and take instructions and help" and noted that "Mugan has demonstrated the ability to coordinate data." (455). Ultimately, Hufford concluded that Mugan possessed skills that could be transferred to 62 occupations. (455). Hufford then tailored those options to further account for Mugan's work history and skill set and concluded that three specific occupations represented "sedentary occupations which are prevalent in Mr. Mugan's labor market" and which had earnings po-

tentials ranging from 197 percent to 371 percent of the required earnings potential under the Plan. (455–56).

On June 10 and 12, 2008, a Hartford examiner called Mugan but she could neither reach Mugan directly nor could she leave a voicemail. (151). Instead, Hartford sent a letter to Mugan on June 12, 2008, noting its unsuccessful attempts to contact him and asking that Mugan return the examiner's call. (151). One day later, Hartford sent a letter to Mugan that stated that it would terminate his benefits on September 2, 2008, the date of the test change. (145–49). In the denial letter, Hartford outlined the various documents in Mugan's claim file and stated:

> [w]e have concluded from the combination of all the medical information in your file that you are able to perform full time sedentary work which includes sitting 8 hours, standing 1–2 hours, walking less than one hour per day … Using this information, a Vocational Rehabilitation Clinical Case Manager performed an employability analysis which showed that there are a number of occupations for which you are qualified that are within your physical capabilities.

(147). Hartford also advised Mugan of his right to appeal the decision within 180 days, to supplement the claim file with additional information, and to request free copies of all documents and records related to his claim. (148).

### D. Mugan's Appeal

On December 10, 2008, Mugan, who retained an attorney, appealed Hartford's decision. (330–405). In a letter brief, Mu-

---

**3.** As noted above, under the Plan's Occupation Qualifier, a claimant is entitled to benefits for two years if he is continuously unable to perform the duties of his occupation. (014). After receiving benefits for two years, a claimant is entitled to benefits under the Occupa-

tion Qualifier only if he is continuously unable to perform "any occupation" for which he is or becomes qualified. (014). The parties refer to change of the Occupation Qualifier as the "disability test change."

gan's attorney detailed his client's heart condition and argued that Mugan suffered from a cognitive impairment as a result of his heart condition. (332–39).

Mugan's attorney attached supporting documentation to the letter brief, including progress notes from his treating physicians, catheterization reports, and stress tests. (340–405). These documents provided a picture of Mugan's heart condition, and a number of the reports from 2007 and 2008 reflected that Mugan's condition was now "stable" and that his prognosis was "fair." (*See, e.g.,* 341–44, 354–60, 378–82).

Also among the documents provided on appeal are opinions about whether Mugan could resume working, including two such opinions from Dr. Friedman, Mugan's treating cardiologist. Specifically, on October 19, 2008, Dr. Friedman noted: "[p]atient should be on full disability due to cognitive disability due to prolonged cardiac arrest. Cardiac status is probably not severe enough to preclude sedentary work although increased stress—angina." (359). However, on October 22, 2008, Dr. Friedman wrote: "[b]ased on [Mugan's] anginal pain, and his cognitive difficulties, I would recommend at this point that [Mugan] would be incapable of performing significant amount of work." (360).

Mugan's attorney also submitted a neuropsychological report from Dr. Shane Bush, a licensed psychologist, to support the argument that he suffered from a disabling cognitive impairment. (362–69). Dr. Bush had administered nineteen tests to Mugan over a period of four days in September 2008 and memorialized his findings in the written report. (362–63). According to Dr. Bush, these tests marked the first time that Mugan had sought or received neurological or mental health services. (363).

Among other things, Dr. Bush found that: Mugan's overall intellectual functioning was in the average to high average range; his attention and concentration scores were in the average to high average range; his learning and memory scores were in the average to high average range; his language skills were in the low average range; his visuospatial skills ranged from low average to high average; and his processing speed scores ranged from extremely low to low.[4] (362–68). Dr. Bush also documented that Mugan's emotional functioning was "consistent with people who feel nervous, agitated, tense, and depressed." (368). Dr. Bush summarized his findings as follows:

> With pre-injury intellectual and neurocognitive functioning estimated to have been in the Superior range, many of Mr. Mugan's current test scores represent a decline from his pre-injury level. Speed of information processing was his greatest weakness, with scores falling not only significantly below his pre-injury level but also in the Extremely Low on an absolute level.... Mr. Mugan's performance in other areas, such as working memory (attention, concentration), was also substantially below his estimated pre-injury level of functioning ...

(368–69). Based on the battery of tests, Dr. Bush concluded that Mugan should not work. (369) ("Mr. Mugan is clearly disabled from his prior work as an equities trader or any position that requires similar activities. In addition, I concur with Mr. Mugan's cardiologist, Dr. Friedman, that

---

4. Each of these descriptive classifications corresponds to an IQ and percentile range as follows: Very Superior (IQ ≥ 130, percentile ≥ 98); Superior (IQ: 120–129, percentile: 91–97); High Average (IQ: 110–119, percentile: 75–90); Average (IQ: 90–109, percentile: 25–74); Low Average (IQ: 80–89, percentile: 9–24); Borderline (IQ: 70–79, percentile: 3–8); Extremely Low (IQ ≤ 69, percentile ≤ 2). (366).

Mr. Mugan should not be working at all and is therefore totally disabled.").

Shortly after the appeal, Hartford assigned an appeal specialist to review Mugan's claim. (81, 142). In the months to follow, Mugan submitted additional information to the appeal specialist. (273–94). Mugan' s attorney also advised the appeal specialist that the Social Security Administration had reversed its previous decision denying Mugan's claim for social security disability benefits. (258–62).

In March 2009, Hartford concluded that an independent review of Mugan's file was appropriate. (077). Hartford therefore contacted MES Solutions ("MES"), a company that provides medical consulting services, and requested that two consultants review Mugan's record. (077, 248–49). MES referred the file to Dr. Mark Eaton and to Dr. Peter Mosbach. Dr. Eaton, board certified in internal medicine with a sub-specialty certificate in cardiovascular disease, analyzed Mugan's claims regarding his cardiac ailments. Dr. Eaton reviewed the record and documented his findings in a report dated March 25, 2009. (212–14). After detailing the records that he reviewed, Dr. Eaton concluded:

> [t]here is no medical documentation submitted to indicate that the claimant would be unable to work full-time … recent cardiac catheterization in 04/2008 demonstrated adequate coronary artery revascularization with the recommendation for continued medical therapy.

**5.** On March 2, 2009, Hartford sent letters to Drs. Bush and Friedman, advising them that Hartford had commissioned an outside evaluation of Mugan's claim. (137–38). In those letters, Hartford stated: "[y]our cooperation in speaking with our consulting physician will help ensure a full and fair review of Mr. Mugan's claim. If our consulting physician is unable to speak to you we will have no choice except to base our decision on documentation currently contained in our file." (137–38). As noted above, Dr. Mosbach, an MES medical

(214). However, Dr. Eaton also noted that Mugan should avoid "light, medium or heavy duty level work activity as defined by the Department of Labor." (214).

Dr. Mosbach, a board certified psychologist and neuropsychologist, analyzed Mugan's claim of cognitive disabilities. (210–12). Dr. Mosbach reviewed the record and spoke with Dr. Bush, who "agreed that the claimant's Verbal and Perceptual Organization indexes, attention and concentration, as well as verbal and visual memory, were all in at least the average range." (210).[5] In a report dated March 25, 2009, Dr. Mosbach concluded:

> Given that the claimant has IQ scores in the average or high average range, has no problems in attention and concentration and no problems in verbal or visual memory, I disagree with Dr. Bush's statement that the claimant is "totally disabled." While he may be showing some decline from his premorbid level of functioning, there is no clinical evidence of any restrictions or limitations from a cognitive perspective.

(212).

On April 14, 2009, Hartford denied Mugan's appeal. (128–33). In the denial letter, Hartford summarized the information in the record before it and reasoned that the totality of the evidence indicated that Mugan's cardiac condition had improved. (129–31). Hartford also concluded that the record lacked specific evidence of a

consultant, successfully contacted Dr. Bush via telephone; however, neither Dr. Mosbach nor Dr. Eaton was able to contact Mugan's treating cardiologist, Dr. Friedman. On March 19, 2009, Mugan's attorney advised Hartford that all communications between MES physicians and treating physicians should be in writing and Mugan's attorney should be copied. (237–38). Thereafter, Drs. Mosbach and Eaton sent a series of questions to Dr. Friedman via facsimile but did not receive a response. (215).

disabling cognitive impairment and that Dr. Bush's neuropsychological evaluation did not counsel otherwise. (131–32).

In conclusion, Hartford advised Mugan .that he had exhausted the administrative remedies available to him and that he was entitled to file a civil action under section 502(a) of ERISA. (132).

## II. Procedural Background

Mugan filed his complaint in the instant action on July 29, 2009. In his complaint, Mugan argues that he is entitled to long-term disability benefits and requests that the Court award him unpaid benefits. On January 11, 2010, Hartford filed an answer and counterclaim. In its counterclaim, Hartford seeks to recover $86,016 from Mugan. According to Hartford, this sum represents the amount of social security disability benefits that Mugan received while receiving benefits under the Plan. Hartford contends that these benefits were never offset against Plan benefits, and thus represent an overpayment of Plan benefits.

On June 25, 2010, Mugan moved for summary judgment. Hartford filed a cross motion for summary judgment on Mugan's claim and on its counterclaim on July 23, 2010.

### DISCUSSION

## I. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 330–31, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial. Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir.1998) (citing Celotex, 477 U.S. at 322, 106 S.Ct. 2548). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir.2010).

## II. Mugan's Claim
### A. Applicable Law

■ "[A] denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a claim administrator has discretionary authority, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary

and capricious.'" *Hobson v. Metro., Life Ins. Co.,* 574 F.3d 75, 82 (2d Cir.2009). Here, the parties agree that the Plan vests Hartford with discretionary authority and that the "arbitrary and capricious" standard therefore applies.

■ "Under the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo v. GNY Auto. Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003); *see also Hobson,* 574 F.3d at 83–84; *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995). Specifically, the determination of an administrator must be upheld unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999). Substantial evidence is "such evidence that a reasonable mind must accept as adequate to support the conclusion reached by the [decision-maker and] requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995) (alterations in original).

■ The existence of a conflict of interest does not alter this standard of review. Rather, a court must take such a conflict into account and "weigh [it] as a factor in determining whether there was an abuse of discretion." *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 133 (2d Cir. 2008) (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115–18, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)). The conflicts analysis proceeds in two steps: first, a court must ask: "whether the plan administrator both evaluates claims for benefits and pays benefits claims. If so, the court goes on to determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, perhaps to the vanishing point." *Durako-*

*vic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 133, 138 (2d Cir.2010) (internal citations and quotations omitted).

## B. Hartford's Decision Was Not Arbitrary and Capricious

Mugan raises various arguments in support of his position that Hartford's decision was arbitrary and capricious. Broadly speaking, these arguments fall into two categories: first, that the evidence upon which Hartford relied was unreliable and inadequate to support Hartford's denial; and second, that the process that Hartford employed when reviewing Mugan's claim and appeal was unprincipled and thus the resulting decision was an abuse of discretion. Hartford responds that the record supports Hartford's conclusion that, as of September 2008, Mugan had recovered from his heart attack and that the record contained no credible evidence of a disabling cognitive condition. We are unconvinced by Mugan's arguments, each of which we address below.

■ First, Mugan argues that Hartford's decision was not supported by substantial evidence because the decision was based "almost exclusively" on the Hufford Employability Report, Dr. Eaton's report, and Dr. Mosbach's report. As a general matter, we disagree with this characterization of the record, which clearly reflects that Hartford considered all of the information in Mugan's claim file, including information provided by Mugan and by his treating physicians. Indeed, Hartford discusses this evidence in both the termination letter, dated June 13, 2008 and the appeal denial letter, dated April 14, 2009. (29–33, 145–49).

■ Second, as noted above, Mugan faults Hartford for relying on the Hufford Employability Report, which Mugan characterizes as "incomplete" and "fundamen-

tally incorrect." In other words, Mugan argues that the report is not based on record evidence and that Hartford's reliance on it was improper. Contrary to Mugan's contention, the Hufford Employability Report relies on Mugan's intelligence level, work history, educational background, and medical condition—all clearly part of the record then in existence. Additionally, Mugan faults Hufford for failing to account for his cognitive impairments. However, the record evidence of any such impairment as of June 2008, when the report was prepared, can be described as sparse at best. Mugan also contends that it was improper for Hufford to conclude that he could work in occupations that required him to handle stress; however, Hufford was entitled to rely on contrary evidence in the record that reflected Mugan's ability to handle stress following his cardiac arrest.

■ Third, Mugan faults Hartford's reliance on Dr. Eaton's report regarding Mugan's heart condition, which Mugan argues does not logically relate to the underlying medical evidence. According to Mugan, Dr. Eaton mischaracterized medical evidence, failed to properly credit Mugan's treating physicians, and failed to acknowledge Hartford's prior conclusions that Mugan was disabled. Again, we note the record contains evidence supporting Dr. Eaton's conclusion, including statements by Dr. Friedman that Mugan could perform sedentary work and medical records that reflected Mugan's improvement. Moreover, Hartford's prior decision to grant benefits is not dispositive in light of the fact that a more onerous disability test would come into effect in September 2008, after Mugan received two years' worth of benefits. Accordingly, Dr. Eaton was entitled to rely on this evidence and Hartford properly considered this report.

■ Fourth, Mugan likewise argues that Hartford's denial was not supported by substantial evidence because Hartford relied on Dr. Mosbach's neuropsychological report, which Mugan criticizes as conclusory. Specifically, Mugan contends that Dr. Mosbach was unreasonable when he concluded that Mugan did not have a disabling cognitive disability because, *inter alia*, any limitations to Mugan's processing speed was not particularly severe because Mugan was able to drive a car. However, what Mugan fails to recognize is that Mugan's ability to drive was only one factor that Dr. Mosbach considered. Mosbach also considered: the general lack of evidence in the record of a cognitive disability; Dr. Bush's findings that Mugan's full-scale IQ, attention and concentration skills, and verbal and visual memory scores were each in the average range; and Dr. Bush's findings that Mugan's verbal and comprehension skills and his perceptual organization skills were in the high average range. (210–12).

In sum, we reject Mugan's arguments that the reports that Hartford commissioned and/or considered lacked credibility and that Hartford's reliance on such reports was therefore unreasonable.

■ Fifth, Mugan argues that Hartford's review was unprincipled because Hartford adopted the conclusions of the reports of Drs. Mosbach and Katon, rather than the conclusions of Dr. Bush and Mugan's treating cardiologist. However, as addressed above, the underlying reports properly considered record evidence. Moreover, Mugan cannot successfully contend that Hartford s reliance on the reports of the reviewing doctors was improper. It is well settled that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123

S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Thus, "when faced with a conflict between the opinion of the treating physician and the opinions of reviewing doctors and independent consultants, it is not arbitrary and capricious for the plan to prefer the reviewing doctors." *Greenberg v. Unum Life Ins. Co. of Am.,* 03 Civ. 1396(CPS), 2006 WL 842395, at *10 (E.D.N.Y. Mar. 27, 2006). On this record, we cannot accept Mugan's argument that Hartford's concurrence with Drs. Mosbach and Eaton resulted from an unprincipled process.

■ Sixth, Mugan argues that Hartford failed to perform a full and fair review of the decision denying the claim as required by section 503 of ERISA. 29 U.S.C. § 1133(2) ("[E]very employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."); *see also Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 86 (2d Cir.2009). Here, Mugan argues that Hartford has offered new justifications in this litigation for its termination of Mugan's benefits.[6] We agree that new justifications may be rejected for lack of notice, *see Curry v. Am. Int'l Grp., Inc. Plan No. 502,* 579 F.Supp.2d 413, 422–23 (S.D.N.Y.2008); however, we disagree that Hartford has proposed new justifications for its termination of Mugan's benefits. Rather, we think Hartford's arguments are more properly construed as specific responses to arguments raised during this litigation. Moreover, the responses are consistent with Hartford's position below that Mugan's heart condition had stabilized, permitting him to perform sedentary work, and that Mugan had failed to demonstrate that he suffered from a disabling cognitive condition.

■ Seventh, Mugan briefly contends that Hartford's initial denial letter, dated June 13, 2008, failed to satisfy the notice requirements of 29 C.F.R. 2560.503–1(g). In relevant part, these regulations provide that a notice of an adverse benefit determination shall set forth, "in a manner calculated to be understood by the claimant":

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review ...

29 C.F.R. 2560.503–1(g). Here, we agree that the original claim denial contains a less fulsome explanation than the letter denying Mugan's appeal. (128–33, 145–49). However, Hartford's initial denial letter satisfies the regulatory requirements: Hartford identified the relevant Plan provisions; stated reasons for the adverse decision, including that Mugan's treating cardiologist reported that Mugan was capable of performing full-time sedentary

---

**6.** Mugan identifies four arguments articulated by Hartford and characterizes these as new: (1) Dr. Bush failed to adequately establish Mugan's pre-disability IQ; (2) Mugan never explained why he failed to seek treatment for any cognitive impairment; (3) Mugan can perform under stress because he took care of his six-year-old son and lived through the premature birth of his second son; and (4) Mugan failed to explain how he worked from September 2005 through early March 2006 if he indeed suffered from cognitive defects.

work; notified Mugan that he may submit additional information to Hartford; described the applicable time limits for an appeal; and apprised Mugan of his right to bring a civil action under ERISA if his claim were again denied on appeal. (145–49).

Eighth, and finally, Mugan argues that Hartford's appellate review was one-sided. For the reasons described above, we conclude that the record plainly reflects that Hartford considered all evidence before it.

Thus, we conclude that Hartford's review process was appropriate and that the process did not yield a conclusion that was arbitrary and capricious.

### C. Conflict of Interest

Next, we consider whether a conflict of interest existed and, if so, how significant a factor it proved to be in Hartford's decision. We agree with Mugan that Hartford had a structural conflict of interest because Hartford both determined the validity of an employee's claims under the Plan and was responsible for paying benefits to claimants. *See Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 133 (2d Cir.2008).

 When determining how heavily to weight this conflict, we are mindful that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Kelly v. Handy & Harman,* No. 10 Civ. 718, 406 Fed.Appx. 538, 539, 2011 WL 159601, at *1 (2d Cir. Jan. 19, 2011) (citing *Durakovic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 133, 138 (2d Cir.2010)).

Here, Mugan contends that Hartford's conflict was significant and is thus entitled to substantial weight. In support of his argument, Mugan argues that Hartford harbored case-specific and structural biases: first, that Hartford terminated Mugan's benefits only after Mugan complained about an underpayment; second, that MES was not independent because it performs repeated reviews for Hartford, including nearly 1500 in 2009; and third, that Drs. Eaton and Mosbach were not independent because they each performed more than 30 reviews in 2009 and were each compensated more than $20,000 in that year.

In opposition, Hartford argues that it has reduced the effect of any conflict of interest by walling off its claim administrators from those interested in firm finances, as endorsed by the Supreme Court in *Glenn.* In support of its argument, Hartford's director of Litigation and Appeals filed a declaration stating that: Hartford does not provide its claims examiners, appeals specialists, or other similar employees with benefits or compensation that are tied to denying claims; Hartford maintains separate units for claims and appeals; each appeal specialist must make an independent assessment of the claim and does not consult the individual who made the initial benefits decision; and the claims and appeals units are wholly separate from the financing and underwriting units. (Declaration of Bruce Luddy, dated July 23, 2010).[7]

In addition, Hartford argues that its relationship with MES, Dr. Mosbach, and Dr. Eaton is of limited significance. Hart-

**7.** Hartford also directs our attention to two recent decisions from this district in which the court concluded that the structural protections outlined above promoted accuracy to such an extent that the conflict deserved little weight. *See Rotondi v. Hartford Life & Accident Grp.,* No. 09 Civ. 6287(PGG), 2010 WL 3720830, at *11–12 (S.D.N.Y. Sept. 22, 2010); *Bendik v. Hartford Life Ins. Co.,* No. 03 Civ. 8138(LAP), 2010 WL 2730465, at *4–5 (S.D.N.Y. July 12, 2010).

ford contends that, as well-trained professionals with relevant credentials, Drs. Mosbach and Eaton would not jeopardize their careers by purposefully mischaracterizing the record. Hartford also argues that the simple fact that the medical consultants were compensated should not, as a general matter, factor heavily into the conflicts inquiry. *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 90 (2d Cir.2009) ("MetLife did not abuse its discretion by considering these trained physicians' opinions solely because they were selected, and presumably compensated, by MetLife.").

In response, Mugan contends that the appeals and claims units of Hartford are not separate because: the head of appeals ultimately reports to the Vice President of "GBD Claims" (albeit indirectly); Hartford's claims and finance groups are not separate because the Assistant Vice President of Financial Development has a "dotted line" relationship to the Vice President of GBD Claims; and Hartford's bonus program is tied, in part, to Hartford's profitability.

Here, there is no evidence that Hartford harbored a case-specific bias (*i.e.*, that Hartford terminated Mugan's benefits in response to Mugan complaining about underpayment). This theory amounts to mere speculation and is not supported by the record. Additionally, we agree that Hartford's corporate structure and policies have abated the risk that Hartford's conflict affected its decision. As described above, Hartford has taken active steps to reduce structural biases and to promote accuracy in its claim administration process.[8] Similarly, Mugan has failed to offer any support for his contention that the Hartford employees who reviewed his claim had a specific financial incentive to deny his claim.[9]

Finally, we reject Mugan's remaining argument that the reviewing doctors were not independent and therefore Hartford's conflict is entitled to greater weight. There is no evidence that either of the medical consultants or MES itself lacked independence. Additionally, we cannot conclude that the medical consultants harbored a bias simply because they were compensated by Hartford for their work in connection with this review and past reviews.

Accordingly, we agree with Hartford that this conflict deserves little weight and we cannot conclude, in light of the record as a whole, that Hartford's decision was arbitrary and capricious. Thus, for the reasons described herein, we deny Mugan's motion for summary judgment and grant Hartford's cross motion on Mugan's claim.

## III. Hartford's Counterclaim

Hartford moves for summary judgment on its counterclaim to recover an alleged $86,016 overpayment of long-term disability benefits. Mugan contends that he and his dependent children only received

---

8. We note that Mugan argues that Hartford's claims, appeals, and finance departments are *not wholly distinct from one another.* However, we fail to see how a limited reporting role among the above-mentioned departments (*i.e.,* from an appeals executive to a claims executive and from a finance executive to a claims executive) affected Hartford's decision here.

9. Mugan cites a case from the Southern District of Ohio where a court concluded that Hartford was biased in its administration of a claim. *See Holler v. Hartford Life & Accident Ins. Co.,* 737 F.Supp.2d 883, 890–91 (S.D.Ohio 2010) (overturning Hartford's denial of a claim for long-term disability benefits). However, that case does not support the argument that Hartford is generally biased in its claims administration, nor does it support the conclusion that Hartford was biased here.

$60,696 in social security disability benefits from September 2, 2006 through September 1, 2008 and that even this lesser amount is not recoverable because Hartford cannot impose a constructive lien on such benefits.

■ Under section 502(a)(3) of ERISA, a plan fiduciary may bring a civil action "to obtain ... appropriate equitable relief ... to enforce ... the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). However, as the statute makes clear, the relief sought must be equitable, rather than legal, in nature. *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361–62, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006).

As is relevant here, fiduciaries of ERISA plans may bring suit under section 502(a)(3) to recover payments to beneficiaries that are later offset by a retroactive award of Social Security benefits. *See, e.g., First Unum Life Ins. Co. v. Wulah*, No. 06 Civ. 1749(JCF), 2010 WL 2541273, at *4 (S.D.N.Y. June 17, 2010) (collecting cases); *Solomon v. Metro. Life Ins. Co.*, 628 F.Supp.2d 519, 534 (S.D.N.Y.2009); *Kellner v. First Unum Life Ins. Co.*, 589 F.Supp.2d 291, 312–13 (S.D.N.Y.2008). In any such action, however, the plan fiduciary "must seek not to impose personal liability on the [claimant], but to restore to the [Plan] particular funds or property in the [claimant's] possession." *Banyai v. Mazur*, No. 00 Civ. 9806(SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) (quoting *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)).

■ Here, there is no dispute that Hartford is a fiduciary under the Plan or that the Long Term Disability Options and Reimbursement Agreement, dated August 9, 2006, permits Hartford to recoup overpayment of long-term disability benefits due to a failure to offset. Thus, Hartford may sue under 502(a)(3) to enforce the terms of the Plan and the Long Term Disability Options and Reimbursement Agreement.

Mugan contends that the counterclaim must be dismissed because federal statutes prohibit the transfer or assignment of social security benefits. *See* 42 U.S.C. § 407(a) ("The right of any person to any future payment under this title shall not be transferable or assignable ... and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment, or other legal process ...."). In support of this argument, Mugan cites two district court cases from outside this circuit and contends that when long-term disability benefits are comingled with social security disability benefits, § 407(a) treats all such funds as out of reach. *See Mote v. Aetna Life Ins. Co.*, 435 F.Supp.2d 827 (N.D.Ill. 2006); *Ross v. Penn. Mfrs. Ass'n Ins. Co.*, No. Civ. A. 1:05–0561, 2006 WL 1390446 (S.D.W.Va. May 22, 2006). However, several other courts have rejected the very argument that Mugan advances here. *See, e.g., Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 232 (1st Cir.2010) ("Although the amount in question happens to be the same as the amount of [the claimant's] retroactive SSDI payment, the funds [the plan administrator] is targeting do not come from SSDI, and thus § 407(a) does not prohibit [the plan administrator's] claim."); *see also Solomon*, 628 F.Supp.2d at 534 (collecting cases).

Because this counterclaim asserts an interest in Hartford's own overpayment of benefits, rather than an interest in Mugan's social security disability benefits, we reject Mugan's argument. However, there remain outstanding issues as to the amount of the social security disability benefits that Mugan received. Accordingly, we grant summary judgment for Hartford but reserve a decision on the amount

of the judgment on Hartford's counter-claim.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (docket no. 13) is denied and defendant's motion for summary judgment (docket no. 17) is granted in part and denied in part. Within two weeks, the parties shall advise the Court if they have been able to stipulate as to the amount of the overpayment. If the parties have not reached an agreement, the parties shall submit a proposed method for the determination of the issue.