**Norman RUND, Plaintiff,**

v.

**JPMORGAN CHASE GROUP LONG TERM DISABILITY PLAN and Hartford Life & Accident Insurance Company, Defendants.**

No. 10 Civ. 5284(LAP).

United States District Court,
S.D. New York.

March 30, 2012.

---

John W. DeHaan, Paul Michael Kamp-fer, DeHaan Busse, L.L.P., Hauppauge, NY, for Plaintiff.

Matthew Paul Mazzola, Michael H. Bernstein, Sedgwick LLP, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, Chief Judge.

Plaintiff Norman Rund ("Plaintiff" or "Rund") brings this action under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that he was wrongfully denied disability benefits by the Hartford Life and Accident Insurance Company, under the terms of a long-term disability plan funded by his former employer, JPMorgan Chase.

Before the Court are the parties' cross-motions for summary judgment. Defendant JP Morgan Chase Group Long Term Disability Plan ("LTD Plan" or "the Plan") and its insurer Hartford Life & Accident Insurance Company ("Hartford" and together with the Plan, the "Defendants") move for summary judgment, claiming that their decision to deny Rund's claim for benefits was not arbitrary and capricious. Plaintiff Rund moves for summary judgment alleging that he is entitled to benefits under the Plan. Defendant Hartford additionally counterclaims for benefits that were overpaid allegedly.

For the reasons set forth below, Defendants' motion for summary judgment [dkt. no. 19] is GRANTED, and Plaintiff's motion for summary judgment [dkt. no. 28] is accordingly DENIED.

## I. Background

The Court has taken the facts described below from the parties' 56.1 statements[1] and Hartford's claim file on Plaintiff.

1. Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert that fact.

2. Inexplicably, the parties refer to Rund's job title at certain times as "Communications Manager" and at other times as "Vice President of Marketing and Communications."

From December 1980 through June 18, 2006, Rund worked for JPMorgan Chase as a Communications Manager.[2] (Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 1.) As a benefit of his employment, Rund received coverage under a long-term disability plan ("the LTD Plan" or "the Plan") established by Hartford. (*Id.* ¶ 2.) Rund's initial claim for long term benefits was approved on February 27, 2007. (*Id.* ¶ 131.) Hartford periodically reviewed Rund's claim for eligibility until Hartford determined that he was no longer eligible for long term disability benefits on February 4, 2009. (*Id.* ¶ 317.) Rund appealed that determination, and the appeal was denied on December 18, 2009. (*Id.* ¶ 493.) This lawsuit followed.

### A. The LTD Plan

Hartford maintained the Plan as Plan Administrator. (Defs.' 56.1 ¶ 6.) The LTD Plan provided long-term benefits to disabled employees and was funded by a group policy of insurance issued by Hartford to the Plan. (*Id.* ¶ 3.)

The LTD Plan provided that "disability or disabled" means:

1. During the elimination period, you are prevented from performing one or more of the Essential Duties of Your Occupation;

2. For the 24 consecutive months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are

(*See, e.g.*, Defs.' 56.1 ¶ 1; *Id.* ¶ 250.) While the Court cannot discern the reason for this discrepancy, the Court treats them as synonymous only for purposes of the motions discussed herein. Additionally, the Court notes that this is not an issue raised by either party and has no bearing on the merits of the case.

less than 80% of your Indexed Pre-disability Earnings;

3. After that, you are prevented from performing one or more of the Essential Duties of Any Occupation.[3]

(Declaration of Donna A. Gatling ("Gatling Decl."), Ex. A at 021.) The LTD Plan further provided that "[y]our Disability must be the result of:" (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse; or (5) pregnancy. (*Id.*)

The LTD Plan granted Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (*Id.*) Benefits will terminate on "the date [the participant] [is] no longer disabled as defined [in the Plan]." *Id.*

The LTD Plan additionally provides that an overpayment occurs:

1. When [Hartford] determines that the total amount we have paid in benefits is more than the amount that was due to [claimant] under the plan; or

2. When payment is made by [Hartford] that should have been made under another group plan. This includes, but is not limited to, overpayments resulting from:

1. retroactive awards received from sources listed in the Other Income Benefits definition;

Other Income Benefits mean the amount of any benefit for loss of income, provided to [claimant] or to [claimant's] family, as a result of the period of Disability for which [claimant is] claiming benefits under this plan. This includes any such benefits for which [claimant or claim-

ant's family] are eligible or that are paid to [claimant], to [claimant's] family or to a third party on [claimant's] behalf, pursuant to any:

. . . 5. disability benefits under

a) The United States Social Security Act or alternative plan offered by a state or municipal government.

(Gatling Decl., Ex. A at 18, 22–23.) The Plan additionally provides that Hartford "[has] the right to recover from [claimant] any amount that [Hartford] determine[s] to be an overpayment." (Gatling Decl., Ex. A at 18.)

## B. Plaintiff's Claim

On April 19, 2006, Rund was injured when he, as a pedestrian, was struck by a bus. (Defs.' 56.1 ¶ 7.) As a result of his illness, Rund ceased working at JPMorgan Chase on June 18, 2006 and applied for short-term disability on June 20, 2006. (Defs.' 56.1 ¶ 8.) On June 20, 2006, Rund telephoned a Hartford claims examiner, and documentation of that exchange states that Rund was "hit by a bus on 4/19/2006 while crossing the street. [Rund] is in therapy for PTSD, seeing psychologist, first visit 6/16/2006 and awaiting further appt. [Rund] is in physical therapy for orthopedic issues four times per week." (Gatling Decl., Ex. B at 57.) Rund's claim for Short-term disability benefits was reviewed by Nurse Alexander and approved on July 27, 2006. (Defs.' 56.1 ¶ 32.)

On June 26, 2006, Hartford received an Attending Physician Statement of Disability ("APS") from Dr. Richard Legouri. (Defs.' 56.1 ¶ 12.) The APS, dated June 23, 2006, stated that the primary diagnoses were lumbar sprain and impingement syn-

---

**3.** The LTD Plan defines "Any Occupation" as "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit percentage and the Maximum Monthly benefit shown in the schedule of Insurance." (Defs.' 56.1 ¶ 55.)

drome and the secondary diagnoses were cervical radiculitis and chondromalacia. (Gatling Decl. Ex. B at 55, 932.)

i. Initial LTD Claim Evaluation

On October 25, 2006, Rund's file was reassigned to Long Term Disability Claims Examiner Michael Shepherd for further handling. (Defs.' 56.1 ¶ 61; Gatling Decl., Ex. A at 41.) Mr. Shepherd requested updated medical records from Rund's neurologist, physical therapist, and orthopedist. (Defs.' 56.1 ¶ 62, Gatling Decl., Ex. B at 182.) On November 11, 2006, Dr. Richard Schaub submitted an APS to Hartford which stated Rund's primary diagnosis as post-traumatic stress disorder ("PTSD") and his subjective symptom as anxiety attacks. (Defs.' 56.1 ¶¶ 64–5; Gatling Decl., Ex. B at 819.) In his APS, Dr. Schaub indicated that Rund could not commute to work "due to pain disorder." (Id.) On the APS form, Dr. Schaub checked off that Rund suffered "[m]ajor [psychiatric] impairment in several areas-work, family relations. Avoidant behavior, neglects family, is unable to work." (Id.)

Mr. Shepherd conducted a telephone interview with Rund on December 7, 2006 concerning his claim for LTD benefits. (Gatling Decl., Ex. B at 179.) According to Mr. Shepherd, Rund stated "that anxiety is what is keeping him from working, however [Rund] stated that the physical issues are not resolved either … stated that Dr. Hainline & Dr. Schaub don't want him to work … [Rund] was referred to Dr. Ira Chernoff by Dr. Legouri for his neck/back issues." (Id.) Rund stated that he was under the care of Dr. Legouri for his left arm and shoulder. (Id.) Mr, Shepherd's record states that "[Rund] has a desk at home where he gets online and checks his email/investments, surfs the web, etc., yet while doing it he has to get up every 20–30 minutes and take a break. He gets aches in his back/neck and tin-gling in his left arm." (Id.) Following review of Rund's entire file, Mr. Shepherd sent the claim file to Behavioral Health Case Manager Diane Baumbach for review on January 2, 2007. (Gatling Decl., Ex. B at 175.)

Ms. Baumbach conducted a telephone interview with Rund on January 8, 2007. (Gatling Decl., Ex. B at 173.) During the conversation Rund reported that his knee was healing very well and his goal is to get back into running, "now walking about a mile 3 times a week." (Id.) Rund did indicate that, at the time of the call, his left arm was "actually getting worse." (Id.) Dr. Legouri was treating Rund for the pain in his left arm resulting from an irritation in the ulnar nerve. (Id.) Rund indicated that his neck pain was improving and that Dr. Chernoff is looking at his back and neck. (Id.) Rund informed Ms. Baumbach that he was currently prescribed a low dose of Zoloft by Dr. Hainline, a neurologist. Rund told Ms. Baumbach that he was seeing Dr. Schaub for regular visits approximately once a month and that Dr. Schaub taught him how to do certain exercises for pain management and controlling anxiety. (Id.)

As to Rund's functionality, he informed Ms. Baumbach that his functional capacity was limited because he's easily distracted and has concentration problems. (Id.) He reported getting "achy" after sitting for a while and difficulty sleeping through the night. (Id.) Ms. Baumbach noted that Rund said he wasn't sure that he could say he was going back to his old job or someplace else that he knew he'd be ready when he could focus. (Gatling Decl., Ex. B at 174.)

On January 15, 2007, Hartford received Rund's medical records from Dr. Brian Hainline's office. (Gatling Decl., Ex. B at 172, 784–787.) The records included three office visit notes from August 14, 2006,

October 19, 2006, and November 29, 2006. (Gatling Decl., Ex. B at 784–787.) On August 14, 2006, Dr. Hainline noted that Rund's sense of apathy had diminished considerably but he was developing more episodes of anxiety. (Gatling Decl., Ex. B at 785.) Dr. Hainline noted that Rund was working with a psychologist and with Caron Hunter. (*Id.*) The note indicated that at that time Rund was still suffering from posttraumatic stress symptomology but overall he was improving. (*Id.*)

On October 19, 2006, Dr. Hainline wrote that Rund had "made some gains." (Gatling Decl., Ex. B at 784.) The doctor additionally stated that Rund tolerated his knee surgery well but had not yet begun knee rehabilitation. (*Id.*) The note also stated that Rund underwent an EMG and nerve conduction velocity study that indicated a mild left ulnar neuropathy. (*Id.*)

The November 29, 2006 note from Dr. Hainline indicated that Rund's recurrence of anxiety had become more significant when his dosage of Zoloft was lowered from 25 mg to 12.5 mg. (Gatling Decl., Ex. B at 787.) Dr. Hainline said that they then increased the dosage to 25 mg daily and that Rund is "now at a level that is much more controllable." Additionally, Dr. Hainline wrote "[h]e is under the care of other physicians for some pain issues. He has begun to bike and he is considering taking up yoga soon. He still undergoes psychological counseling ... [h]e still has PTSD symptomatology and I believe he will need to be on Zoloft for the [foreseeable] future." (*Id.*)

Dr. Chernoff sent Hartford an office visit note dated January 8, 2007. (Rund000428.) The note indicated that Rund was able to "toe and heel walk," "his extension is to neutral," and "he has pain related to the lower lumbar spine." (*Id.*) Dr. Chernoff wrote "[h]e notes that the neck is approximately 80% improved with

the physical therapy." (*Id.*) The note included a reference to an x-ray taken of Rund's cervical and lumbar spine indicating degenerative arthritis of the cervical spine (C2–3, C4–5, and C5–6), with degenerative joint disease of the lumbar spine (worse at L3–4 and L4–5). (*Id.*)

On January 18, 2007, Ms. Baumbach called Dr. Schaub to discuss his opinion concerning Rund's functional capacity. (Gatling Decl., Ex. B at 171.) In her record of the conversation, Ms. Baumbach noted that Dr. Schaub said "[Rund] can complete his ADL's with no stress, at home. And he gets an occasional sudden sharp pain. So, he is unpredictable to himself—physically." (*Id.*) As to Rund's emotional status, Ms. Baumbach noted that Dr. Shchaub said "[Rund] flies off the handle—goes into a rage—and asks himself how am I going to be with people, which you could call a form of PTSD— without the triggers, but not in the exact sense—he has anger and rage." (*Id.*) Dr. Schaub also relayed an incident of road rage Rund experienced which caused him to miss an appointment. (*Id.*) Dr. Schaub indicated that a "return to work is not a focus ... [s]ince, he lives way out of the island, in Coram, and his work was in Manhattan. Getting to work is a problem. If he were to return, I would think it would be something out of the home." (*Id.*)

Ms. Baumbach also inquired of Dr. Hainline as to Rund's functional capacity and Hartford received a response to this request for information on January 22, 2007. (Gatling Decl., Ex. B at 779.) Specifically, Ms. Baumbach wrote "[y]ou have submitted information indicating that claimant has been seen by you only every 2 months since going out of work, he is on very low dosage of anti-depressant, and apparently only sees his therapist monthly. Please help me understand how this level of treatment intervention is supportive of

someone who is psychiatrically disabled?" (*Id.*) To which Dr. Hainline responded that he was providing "standard of care" treatment. (*Id.*) Dr. Hainline stated "although improved, [Rund] has continued PTSD symptoms that interfere with daily living" and wrote that the treatment plan to transition Rund back to work includes ongoing care and time, "which normally resolves PTSD." (*Id.*)

On January 24, 2007, Susan Spagnoli, a Physical Therapist, conducted an initial evaluation of Rund. (Gatling Decl., Ex. B at 166; 789.) Ms. Spagnoli's evaluation indicated that Rund's range of motion for a right and left side bend of his lumbar spine was 60% while his range of motion for his bilateral movement was 50%. (Defs.' 56.1 § 118; Gatling Decl., Ex. B at 789.) Ms. Spagnoli's evaluation also showed that Rund's left arm strength ranged from 4–/5 to 4+/5. (*Id.*)

On January 25, 2007, Mr. Shepherd conducted a telephone interview of Rund. (Gatling Decl., Ex. B at 169.) Rund indicated that he was still in pain in his back and arm and could not complete an entire eight-hour workday with the combination of pain and mental issues. (*Id.*) Rund reported that he could not sit for extended periods of time (longer than 20 minutes) before he has to get up and stretch. (*Id.*) During that phone call Rund indicated that he feels he could work "a couple of hours a day … before his pain becomes unbearable." Rund said he felt as though he was disabled from a combination of the physical and mental issues. (*Id.*)

On February 16, 2007, Hartford received and reviewed an APS from Dr. Marc Chernoff, Rund's treating Orthopedist, dated February 15, 2007. (Gatling Decl., Ex. B at 167, 846–847.) Dr. Chernoff diagnosed Rund with lower back pain secondary to cervical arthritis and neck pain. (Gatling Decl., Ex. B at 846.) Dr. Chernoff indicat-

ed that upon examination, Rund's cervical flexion, extension, and lateral rotation were good and that he was able to flex and extend his lumbar spine significantly. (*Id.*) Dr. Chernoff noted that he referred Rund to Dr. Mainline and Dr. Legouri. (*Id.*) Dr. Chernoff's plan of treatment included follow-up visits and physical therapy. (*Id.*) The APS form provided ample space for Dr. Chernoff to indicate specific functional restrictions or limitations of Rund, but instead he wrote "recommendation not to work a[t] present." (Gatling Decl., Ex. B at 847.) The APS asked Dr. Hainline to estimate how long he expected physical or psychiatric limitations to last, and Dr. Hainline said that he would he that at the next visit. (*Id.*)

Mr. Shepherd, after reviewing all of the above-referenced medical records and evaluations, determined that while the records showed degenerative disc disease and degenerative joint disease in his lumbar and cervical spine, the records did not indicate any restrictions or limitations that would preclude Rund from performing one or more of the Essential Duties of his own occupation. (Defs.' 56.1 ¶ 122.) Mr. Shepherd referred the matter to Hartford Nurse Case Manager Marie Murphy on February 16, 2007. (*Id.*) On February 21, 2007, Nurse Murphy, after receiving the file, contacted Spagnoli Physical Therapy and spoke with Keith Perucci. (*Id.* ¶ 123.) Nurse Murphy called to inquire about the January 24, 2007 office visit note, which was mostly illegible. (*Id.*) Mr. Perucci advised Nurse Murphy that per his review of the note, Rund's range of motion showed shoulder 4+/5, scapula 4/5, triceps 4–/5, and wrist 4/5. (*Id.* ¶ 124.)

Following her review of Rund's file, Nurse Murphy "determined that the medical evidence supported a functional impairment to sustain prolonged sitting and sustained use of left upper extremity to allow

for continued physical therapy to address continued deficits." (*Id.* ¶ 128.) Nurse Murphy wrote "[i]improvement in function sufficient to return to full duty sedentary activities is expected within six months. Recommend update in three months to obtain current restrictions, treatment plan and ERTW date." (Gatling Decl., Ex. B at 164.) Mr. Shepherd reviewed the file, including Nurse Murphy's assessment, and determined that it was reasonable to accept that Rund was functionally unable to perform one or more of the Essential Duties of his occupation, and he recommended that his supervisor accept Rund's claim. (Defs.' 56.1 ¶ 130.) Rund was informed that his claim for LTD Benefits had been approved by letter dated February 28, 2007. (*Id.* ¶ 132.)

On June 25, 2007, Hartford was notified that Rund's claim for Social Security Disability ("SSDI") had been denied by the Social Security Administration ("SSA"). (*Id.* ¶ 133.) The SSA determined that Rund's condition was not severe enough to keep him from his work as a Vice President of Marketing and Communications at JPMorgan Chase. (*Id.* ¶¶ 134–135.)

After Rund's initial benefits determination was approved, Hartford conducted milestone interviews on: July 10, 2007 and December 17, 2007. (*Id.* ¶¶ 136, 165.) On September 18, 2007, Hartford's Special Investigations Unit ("SIU") proactively reviewed Rund's claim. (*Id.* ¶ 170.) The claim was accepted for investigation due to the fact that Rund had reported restrictions and limitations that were inconsistent[4] with his medical file. (*Id.* ¶ 171.) The investigation concluded on January 11, 2008 because the observed activity was not inconsistent with Rund's reported restrictions and limitations. (*Id.* ¶ 173.)

The LTD Plan provides that the definition of disability changes from an inability to perform the material duties of "Your Occupation" to the more rigorous "Any Occupation" after 24 months. (Gatling Decl., Ex. A at 21.) Beginning on June 30, 2008, Hartford Claims Examiner Amy E. Patterson reviewed Rund's file according to the Plan's more rigorous "Any Occupation" disability definition. Ms. Patterson requested that Rund complete a new claimant questionnaire and up to date medical records. (*Id.* ¶ 176.)

Dr. Hainline submitted an APS to Hartford dated July 22, 2008 in which he indicated that Rund was physically able to sit, stand, and walk for two hours a day for one hour consecutively. (Gatling Decl., Ex. B at 708–709.) Dr. Hainline also determined that Rund had no restrictions in lifting one to ten pounds bilaterally, could frequently lift 11 to 20 pounds, and could occasionally lift 21 to 50 pounds bilaterally. (Gatling Decl., Ex. B at 709.) Dr. Hainline also submitted several office visit notes. One note dated February 21, 2008, indicated that an MRI of Rund's lumbar spine from December 2007 was "largely unremarkable." (Gatling Decl., Ex. B at 707.) Dr. Hainline noted that the main issue continues to be posttraumatic anxiety. (*Id.*) On March 4, 2008, Dr. Hainline wrote "[Rund] came in to review his neuropsychological study. This study showed difficulty with processing information, but it is felt that this is more for emotional/anxiety reasons and not because of primary cognitive deficits per se." (Gatling Decl., Ex. B at 706.)

On September 17, 2008, Ms. Patterson reviewed the updated records from Dr. Chernoff. Those medical records included

---

4. Rund reported that he had pain in his back, shoulders, and arm; however, the medical records stated that he had 80% improvement in his neck and that the strength in his upper extremities was four out of five. (Defs.' 56.1 ¶ 172.)

office visit notes dated January 25, 2008, May 30, 2008, and July 11, 2008. On September 18, 2008, Rund's claim file was referred to Hartford Nurse Case Manager Murphy. (Gatling Decl., Ex. B at 136.) On . September 25, 2008,[5] Nurse Murphy found that a functional impairment precluding Rund from prolonged sitting and occasional walking and standing was not supported from a physical perspective. (Gatling Decl., Ex. B at 133.) Additionally, Nurse Murphy found that Rund's cognitive issues were a result of his PTSD and anxiety and unrelated to any organic source. (*Id.*) Following her findings, Nurse Murphy referred Rund's file to Carrie Jones, Hartford Ability Analyst, on October 1, 2008.

Ms. Jones conducted a telephone interview of Rund on October 6, 2008 following her receipt of a completed Claimant Questionnaire from Rund. (Defs.' 56.1 ¶¶ 221, 226.) In the questionnaire, Rund indicated that he had bilateral hand pain, occasional left arm ulna nerve pain, and constant left leg pain. (*Id.* ¶ 227.) Rund also stated that he was able to read, write, and walk his dog. (*Id.* ¶ 228.) Rund was unsure if he had undergone a neuropsychological evaluation and indicated that he did not believe his mental/nervous condition was disabling at that time. (Defs.' 56.1 ¶¶ 222, 225.) Rund told Ms. Jones that he is unable to work due to the anxiety he feels a result of PTSD, short term memory loss, anger, and loss of concentration. Rund also said that he was *physically* able to return to work with certain restrictions, including the ability to get up and move every 20 minutes. (*Id.* ¶ 224.) On Octo-

ber 11, 2008, Dr. Mainline informed Hartford that Rund's restrictions and limitations set forth in the APS dated July 22, 2008 were solely related to Rund's psychological symptoms and subjective complaints. (Gatling Decl., Ex. B at 128.)

On November 10, 2008, Rund's file was transferred to Hartford Ability Analyst Koni Torres. (*Id.*) Ms. Torres determined that she needed updated psychological records. (*Id.*) Dr. Michael Kirschner, a licensed Clinical Psychologist, submitted a mental APS dated November 25, 2008. (Gatling Decl., Ex. B at 126.) Dr. Kirschner indicated that while Rund's functionality could be impacted by his depression and anxiety, he found that Rund was functionally able to perform full time work at a sedentary capacity level. (Gatling Decl., Ex. B at 126, 659–60.)

Ms. Torres referred the claim file to Hartford Rehabilitation Case Manager Lisa Hufford on December 8, 2008 for purposes of preparing an Employability Analysis Report ("EAR"). (*Id.* ¶ 239.) Ms. Hufford completed the EAR[6] and determined that Rund possessed the skills and functionality required to perform several alternate sedentary occupations. (*Id.* ¶ 252.) Specifically, Ms. Hufford found that Rund was qualified and able to perform the essential duties of a "Manager, Department," "Manager, Computer Operations," and "Manager, Data Processing." (*Id.* ¶ 253.) Ms. Hufford noted that the national median wage for all three of these occupations exceeds the earnings potential

---

**5.** On September 25, 2008, Nurse Murphy made this determination based on a review of Rund's entire file. On September 23, 2008, Nurse Murphy telephoned and sent a request via fax to Dr. Hainline in order to obtain clarification regarding assigned restrictions of sitting, standing and walking. (Gatling Decl.,

Ex. B at 133.) Nurse Murphy did not receive a response to her inquiry. (*Id.*)

**6.** Rund's EAR was based on the medical information in Rund's claim file and Rund's own description of his job duties as a Vice President. (Defs.' 56.1 ¶¶ 249–50.)

required by the LTD Plan.[7] (*Id.* ¶ 254.)

Prior to making a benefits determination, Ms. Torres sought clarification as to Rund's functional capacity as provided by Dr. Kirschner because he indicated that Rund was able to work full-time at a sedentary level. (*Id.* ¶ 257.) Ms. Torres referred the file to Ms. Baumbach on December 17, 2008. On December 24, 2008, Dr. Kirschner indicated that his November 25, 2008 APS was inaccurately completed with respect to the "functionality" section. (*Id.* ¶ 259.) Dr. Kirschner told Ms. Torres that Rund was indefinitely disabled from work at that time and that Rund's psychiatric impairments were causing his lower back pain. (*Id.* ¶¶ 260–61.) When asked to comment on his change of opinion, Dr. Kirschner responded "that was a misunderstanding of the import of the directions on the questionnaire." (Gatling Decl., Ex. B at 107.)

Dr. Kirschner submitted several office visit notes to Hartford from November 10, 2008 to December 9, 2008. (Defs.' 56.1 ¶ 262.) On November 10, 2008, Dr. Kirschner documented that Rund's Zoloft prescription was discontinued and that he was now only taking Remeron. (*Id.* ¶ 264.) During that same visit, Rund told Dr. Kirschner that he loved writing and was working on his second novel. (*Id.* ¶ 265.) On November 28, 2008, Rund stated that

he had difficulties with impulse control and experienced an incident of "road rage." (*Id.* ¶ 267.) On December 2, 2008, Rund reported anxiety was better but did reiterate his complaints of impulse control problems. (*Id.* ¶¶ 268–69.)

Following the clarification from Dr. Kirschner and review of the entire file, Ms. Baumbach determined that Rund could function outside of the work situation and that the information provided did not clearly support functional limitations and restrictions. (*Id.* ¶ 280.) Ms. Baumbach discussed the matter with Ms. Torres and determined that an Independent Medical Record Peer Review Consultant Report was necessary. (*Id.* ¶ 281.) On January 2, 2009, Ms. Baumbach requested that Medical Advisory Group ("MAG"), an independent peer review vendor, retain and schedule neurological and psychiatric independent peer medical record reviews. (*Id.* ¶ 282.)

MAG retained Dr. Stuart Gitlow, who is board certified in General, Addiction, and Forensic Psychiatry, to conduct an independent medical record peer review. (*Id.* ¶ 283.) In his January 18, 200 report, Dr. Gitlow indicated that he reviewed Rund's entire file [8] and indicated that since his 2006 accident, Rund had complained of anxiety and panic symptoms and difficulty with short-term memory loss and cognitive

---

7. "Disability or Disabled" means: ... "for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre–Disability Earnings; (3) after that, you are prevented from performing one or more of the Essential Duties of Any Occupation. If at the end of the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, but your Current Monthly Earnings are greater than 80% of your Pre–Disability Earnings, your Elimination Period will be extended for

a total period of 12 months from the original Date of Disability, or until such time as your Current Monthly Earnings are less than 80% of your Pre-disability earnings, whichever occurs first." (Gatling Decl., Ex. B at 210.)

8. Dr. Gitlow indicated that he reviewed all of the information in Rund's file, including the documented phone calls between Rund and various Hartford representatives. (Defs.' 56.1 ¶ 284.) Additionally, Gitlow contacted Dr. Kirschner, whom he spoke to on January 14, 2009, and Dr. Hainline, whom he was unable to reach. (*Id.* ¶¶ 284–85.)

issues. (*Id.* ¶¶ 284, 288.) Dr. Gitlow reported that during his conversation with Dr. Kirschner, Dr. Kirschner stated that Rund was in a "bad position" to return to work. (*Id.* ¶ 287.) Despite Rund's complaints, Dr. Gitlow noted that Rund had never received psychiatric treatment or evaluations with respect to those complaints, though a referral was considered on June 2, 2008. (Gatling Decl., Ex. B at 617.) Dr. Gitlow indicated in his report that the only psychiatric treatment from Rund's treating neurologist was limited to a single SSRI provided at low dosages for more than two years. (*Id.*) Dr. Gitlow found that Rund's claimed impairments were unsupported by the objective psychiatric findings in his medical records and Rund's file records did not contain any description of cognitive difficulties that would be impairing. (Defs.' 56.1 ¶¶ 291–92.) Dr. Gitlow noted the presence of PTSD symptoms but wrote that the typical course of this illness following such a singular event does not involve long-term difficulties. (*Id.* ¶ 293.)

Additionally, MAG retained Dr. Richard Levy, a physician board certified in Neurology, to conduct an Independent Medical Record Peer Review. (*Id.* ¶ 294.) Dr. Levy reviewed all of the information in Rund's medical records.[9] Dr. Levy found that Rund experienced a variety of symptoms without any neurological correlation and also noted that there were no neurological abnormalities ever identified in Rund's records. (*Id.* ¶¶ 297–98.) Dr. Levy reviewed physical therapy notes that documented improvement in his neck, back, and upper extremities. (*Id.* ¶ 299.)

Dr. Levy found that Rund's records showed no neurological objective findings that would result in restrictions or limitations different from his prior level of function and that Rund could perform the duties of a sedentary position. (*Id.* ¶ 300–301.)

Ms. Baumbach reviewed the peer review report and on January 26, 2008 determined preliminarily that Rund's subjective complaints of physical and neurological impairments did not support any limitations or restrictions. (*Id.* ¶ 302.) Because the peer reviewers were unable to communicate with Dr. Hainline, Ms. Baumbach requested that Dr. Hainline comment on the two reports.[10] (*Id.* ¶ 303.) Dr. Hainline agreed with Dr. Levy's opinion but disagreed with Dr. Gitlow's evaluation because it was incomplete. (*Id.* ¶ 305.) Dr. Hainline indicated that Dr. Levy's report was incomplete because he ignored a neuropsychological report. (*Id.* ¶ 306.) Ms. Baumbach reviewed the file again and concluded that no neuropsychological report had ever been submitted for Rund and that Dr. Hainline did not submit any clinical findings to support his opinions, despite the request to do so. Thus, Ms. Baumbach's assessment remained unchanged. (*Id.* ¶ 309–310.)

On February 2, 2009, Ms. Baumbach referred Rund's file back to Ms. Torres for purposes of making a determination on Rund's claim for continuing LTD benefits under the LTD Plan's "Any Occupation" disability definition. (*Id.* ¶ 312.) Ms. Torres sent the file to Ms. Hufford to re-review her EAR dated December 8, 2008

---

**9.** Dr. Levy reviewed all of the information in Rund's file, including the documented phone calls between Rund and various Hartford representatives. (Defs.' 56.1 ¶ 195.) Dr. Levy noted that he attempted calling Dr. Hainline on three separate occasions but did not re-

ceive a return call prior to drafting his report dated January 19, 2009. (*Id.* ¶¶ 295–96.)

**10.** In his response, Dr. Hainline noted that he tried to call both doctors back but his calls went unanswered. (Gatling Decl., Ex. B at 560.)

in light of the co-morbid peer review reports and include January 2009 wage indexing. (*Id.* ¶ 313.) On February 4, 2009, Ms. Hufford determined that Rund was able to perform full-time work activities requiring prolonged sitting and the results of her original EAR remained mostly unchanged. (*Id.* ¶ 314.)

### ii. Hartford's Initial Denial

By letter dated February 5, 2009, Ms. Torres notified Rund that Hartford denied his claim for continuing LTD benefits based on policy language and a thorough review of all the records in his claim file. (*Id.* ¶ 319.) Hartford determined that Rund did not meet the policy definition of Disability for his physical condition beyond February 4, 2009. (Gatling Decl., Ex. B at 210.) In the letter, Ms. Torres included a description of the LTD Plan benefits as applicable to Rund, a list of the papers in his file, a brief description of his records, information regarding the EAR conducted by Hartford, and Rund's right to appeal the decision under ERISA. (Gatling Decl., Ex. B at 210–214.)

### iii. Rund's Appeal

Hartford received Rund's appeal letter on February 23, 2009 and transferred it to the Hartford Appeals Unit. (Defs.' 56.1 ¶ 332.) Rund's appeal was assigned to Hartford Appeals Specialist Donna Gatling. (*Id.*) Rund argued that the opinions of his treating physicians had been ignored and that Dr. Gitlow's evaluation was incomplete because of his failure to review Dr. Martin Friedmutter's neuropsychological report.[11] (*Id.* ¶ 334.)

In the letter, Rund informed Hartford that he was receiving treatment from Dr. J. Rieben, a board certified psychiatrist, and that Hartford should obtain her records on his case. (*Id.* ¶ 336.)

Dr. Friedmutter's February 4, 2008 Neuropsychological Test Report stated that Rund visited the office and underwent several neuropsychological tests. (*Id.* ¶ 338.) With respect to his behavioral observations of Rund, Dr. Friedmutter wrote; Mr. Rund presents as a friendly and cooperative individual. He did not display any overt signs of anxiety. Mr. Rund explained that he is currently writing a book. He went on to explain that his writing style is extremely complicated and that he has to remember several plots and sub plots at the same time. . . . Mr. Rund is able to read, understand and retain complicated information. . . . Mr. Rund's reported anxiety did not interfere with his ability to perform mathematical calculations. Mr. Rund did indicate that he had forgotten how to solve several mathematics problems since he had not performed such calculations since attending school.

(Gatling Decl., Ex. B at 562.) Dr. Friedmutter did note that during "informal tests of memory," Rund's "reported anxiety appeared to interfere with his ability to remember and retain material presented in an auditory manner." (Gatling Decl., Ex. B at 563.)

On or about May 26, 2009, Hartford received Rund's SSA Notice of Award dated May 12, 2009. (Defs.' 56.1 ¶ 349, 352.) The SSA Notice of Award indicated that Rund's claim for SSDI benefits, which was initially denied in 2007, was approved and Rund was found to be disabled retroactive to December 2006. (*Id.* ¶¶ 350–51.) The Notice of Decision issued on May 1, 2009 included a review of Rund's impairments

---

11. As noted above, Dr. Friedmutter's neuropsychological report had never previously been submitted to Hartford. Rund annexed the report to his appeal letter. (Defs.' 56.1 ¶ 337.)

based on the records Rund submitted to the SSA. (*Id.* ¶ 355.)

Rund submitted a supplemental appeal letter in which he argued that Hartford should reverse its initial adverse determination and alleged the following reasons: (1) Hartford's failure to consider the totality of Rund's medical conditions; (2) Hartford's EAR failed to consider his age, medical history, and current impairments, and the "grim" condition of the economy; (3) Hartford favored the opinions of the peer review doctors and ignored those of his treating physicians; (4) Hartford should have considered and relied on the SSA's finding of disability; and (5) Hartford did not consider that Rund is disabled by the side-effects of the several medications he had been prescribed. (Gatling Decl., Ex. B at 349–74.) Rund submitted additional medical documentation [12] and a Vocational Assessment completed by Amy Peiser–Leopold dated August 12, 2009 (Defs.' 56.1 ¶ 454.)

In her Vocational Assessment, Ms. Peiser–Leopold addressed each of the three alternative occupations that the EAR indicated Rund could perform based on his abilities and qualifications. (Gatling Decl., Ex. B at 494.) Ms. Leopold wrote "[i]t is this Consultant's opinion that Mr. Rund would be unable to perform any of these recommended occupations based on the determination that he is unable to perform his own occupation and that he does not have the ability to perform even sedentary work." (*Id.*)

After reviewing Rund's appeal letter and the additional medical records annexed thereto, Ms. Gatling determined that a co-morbid peer review was necessary to determine Rund's functional capacity and restrictions/limitations. (*Id.* ¶ 461.) Hartford requested that MES Solutions retain co-morbid independent medical record peer reviews in the fields of clinical neuropsychology and physical medicine and rehabilitation. (*Id.* ¶ 461.)

MES Solutions retained Dr. Joseph Ricker, a licensed Clinical Neuropsychologist, and Dr. Ehpraim Brenman, a physician board certified in Physical and Rehabilitation Medicine, to conduct independent medical record peer reviews of Rund's medical records. (*Id.* ¶¶ 462, 475.) Dr. Ricker concluded that no objective evidence was presented to support any ongoing psychological or cognitive disabilities. (*Id.* ¶ 474.) Dr. Brenman concluded that there was a lack of objective findings to support Rund's ongoing subjective symptoms of back and neck pain. (*Id.* ¶ 485.)

Dr. Ricker reviewed all of the medical records in Rund's file and discussed Rund's medical condition with Dr. Kirschner, Rund's treating psychologist. (*Id.* ¶ 463.) In a conversation on November 12, 2009, Dr. Kirschner informed Dr. Ricker that he was seeing Rund monthly and that Rund was making progress with his treatment. (*Id.* ¶¶ 464, 466.) Dr. Kirschner also said that Rund had expressed interest in returning to work but that he had a functional memory impairment for recent events. (*Id.* ¶ 465.) In his November 19, 2009 report, Dr. Ricker indicated that Rund's records did not contain any evi-

---

**12.** Rund submitted the following: (1) multiple impairment questionnaire completed by Dr. Hainline dated August 17, 2009; (2) Dr. Hainline's treatment records for June 8, 2006 through March 28, 2009; (3) treatment records from Dr. James Penna dated August 8, 2007; (4) treatment records from Dr. Jay Nathan for the period of October 2, 2008 through July 14, 2009; (5) treatment records from Dr. Ira Chernoff for the period of November 27, 2006 through May 29, 2009; (6) treatment records from Dr. Lawrence Hurst for the period of June 11, 2007 through July 24, 2009; and (7) treatment records from Dr. Hong Xu. (Gatling Decl., Ex. B at 329.)

dence of objectively identifiable cognitive impairment. (*Id.* ¶ 469.) Dr. Ricker specifically noted that Rund's memory and anxiety disturbances are solely based on Rund's self-reports and the one informal exercise conducted by Dr. Friedmutter. (*Id.* ¶ 470.) Dr. Ricker concluded that he had not seen any objective evidence to support any ongoing psychological or cognitive disabilities. (*Id.* ¶ 474.)

Dr. Ehpraim Brenman, board certified in Physical Medicine and Rehabilitation, also conducted a peer review of Rund's medical records on file. (*Id.* ¶ 475.) Dr. Brenman reported that he was told by Dr. Chernoff on November 16, 2009 that Rund had neck and lower back pain, and some "partial disability." (*Id.* ¶ 478.) Dr. Brenman found that the only physical restrictions/limitations concerning Rund's functional capacity are the result of his left knee meniscotomy and his left shoulder impingement. (*Id.* ¶ 483.) These limitations would restrict Rund to only occasional squatting and only occasional overhead lifting and reaching of over twenty-five pounds. (*Id.* ¶ 484.) Dr. Brenman referred to the MRI scans of Rund's spine and the EMG tests, as well as Dr. Hurst's office notes indicating Rund's improvement. (*Id.* ¶¶ 486–87.) Dr. Brenman concluded that there was a lack of objective findings to support Rund's subjective symptoms of back and neck pain. (*Id.* ¶ 485.)

Ms. Gatling upheld Hartford's determination denying Rund's claim for continuing LTD benefits on December 18, 2009. (*Id.* ¶ 493.)

## II. Discussion

### A. Legal Standard

A moving party is entitled to summary judgment only " 'if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affi-davits, if any, show that there is no genuine issue as to any material fact and that [the party is] entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Overton v. N.Y. State Div. of Military & Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004).

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002). Here, because each party is moving for summary judgment, the moving party bears the initial burden of providing the basis for the motion and of identifying the evidentiary materials, if any, supporting the moving party's position. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The non-moving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). Mere speculation and conjecture will not suffice. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003).

### B. Applicable Standard of Review

#### 1. Deferential Standard Applies

"Although generally an administrator's decision to deny benefits is reviewed *de novo,* where ... written plan documents confer upon a plan administrator the discretionary authority to deter-

mine eligibility, [a court] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir.2009). "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999) (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995)).

■ The parties do not dispute that the plan documents vest discretionary authority to administer the plan and interpret plan terms in Hartford, the Plan Administrator. However, Plaintiff argues that the Court should "review this ERISA case under a contract theory." (Pl. Mem. at 9.)

Plaintiff's argument that the Court should review this ERISA claim under a state law breach of contract theory is not supported by legal precedent, as Plaintiff himself notes. (*Id.* at 11.) Plaintiff mistakenly emphasizes the importance of the source of funding for the LTD Plan. Here, JPMorgan Chase purchased a group policy from Hartford, paid the premiums thereto, and Hartford administered claims under the Plan. Rund argues that he is but a third-party beneficiary of the group insurance policy—a contract—and that the Court should review his claim under a *de novo* standard of review. (Pl. Mem. at 11.) Plaintiff himself stated "Plaintiff acknowledges that his claim for LTD benefits is preempted, and, therefore, subject to ERISA and its regulations," (Plaintiff's Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment ("Pl. Opp.") at 3), but continues to challenge the standard of review. The Court need not go further as Plaintiff himself admits his claims are preempted by ERISA.

■ Under this deferential standard, a plan administrator abuses its discretion where its decision "was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, No. 05 Civ. 3297, 2010 WL 1253481, at *10 (citing *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 623–24 (2d Cir. 2008)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir.2003) (internal quotation marks omitted). Additionally, the Court must evaluate "whether the decision was based on a consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995).

■ "Notwithstanding the deferential nature of the arbitrary and capricious standard, courts have held that ERISA guarantees that the plan's administrator, the fiduciary, must provide full and fair review of the decision to deny the claim." *Neely v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00 Civ.2013, 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004). Under this deferential standard, the Court notes that this is not a mere perfunctory review of the factual record, "[r]ather such a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06 Civ. 2285, 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (internal quotation marks omitted);

accord *Juliano v. Health Maint. Org. of N.J., Inc.,* 221 F.3d 279, 287 (2d Cir.2000).

## C.  Hartford's Full and Fair Review

### 1.  Initial Denial

On February 5, 2009, Hartford issued an initial determination denying Rund's continuing claim for LTD benefits under the "Any Occupation" disability definition. (Defs.' 56.1 ¶ 319.)  Ms. Torres informed Rund by letter that his claim was denied based on policy language and a thorough review of all the records in his claim file. (Gatling Decl., Ex. B at 212.)  The letter identified the following papers in Rund's file:  work and educational history form completed on 9/26/2007;  Dr. Kirschner's APS dated 11/25/2008;  Dr. Chernoff's office note dated 1/25/2008;  Dr. Mainline's completed letter questionnaire dated 9/25/2008;  the medical case manager assessment dated 9/25/2008;  the EAR completed on 2/04/2009 by vocational clinical case manager;  the reports of Dr. Levy and Dr. Gitlow;  and Dr. Mainline's response dated 1/30/2009.  (Gatling Decl., Ex. B at 212.)  Ms. Torres' letter included a recitation of the relevant documents and Rund's statements and stated that based on that information, Hartford concluded that Rund is not prevented from performing the essential duties of Any Occupation. (Gatling Decl., Ex. B at 213.)  Hartford informed Rund that after a thorough review of his claim file, his medical records were missing descriptions of *cognitive difficulties* that would be impairing and objective neurological abnormalities that prevented him from performing "Any Occupation."  (*Id.*)  Hartford advised Rund that if he wished to appeal, he should submit proof addressing these issues. (*Id.*)

On appeal, Rund provided the neuropsychological report from Dr. Friedmutter, which, as noted above, was not provided prior to the initial determination of February 5, 2009.  Hartford considered the report of Dr. Friedmutter which indicated that during an informal test Rund experienced some anxiety that impacted his performance, but otherwise his results were normal.  (Gatling Decl., Ex. B at 563.)

### 2.  Denial on Appeal

The December 18, 2009 letter to Rund indicated that his appeal was denied. (Defs.' 56.1 ¶ 493.)  The letter stated that the review of Rund's file included medical assessments completed by Dr. Ricker and Dr. Brenman, physicians from MES solutions.  (Gatling Decl., Ex. B at 195.) Hartford wrote that it considered all of the information submitted on appeal, as well as the information submitted pursuant to the original request.  (*Id.*)  It specifically stated "[p]lease note that [Rund's] physician statements and information were noted also."  (*Id.*)

■ In light of the extensive record, Hartford's explanatory letters of denial, and the objective and subjective evidence, the Court concludes that Hartford's denial of benefits was not unreasonable and was not arbitrary and capricious.

## D.  Plaintiff's Arguments are Unavailing

Plaintiff's primary challenges to Hartford's determination revolve around (1) Hartford's reliance on the opinion of its peer review physicians;  (2) Hartford's reliance on its own in-house vocational consultants Lisa Hufford and Sharon Sullivan; (3) Hartford's Failure to consider the decision of the SSA;  and (4) Hartford's alleged conflict of interest.  Each allegation will be reviewed in turn.

### 1.  Peer Review Physicians

The initial determination of February 5, 2009 and the final determination of December 18, 2009 took into account the opinions

and findings of Rund's treating physicians as well as several peer-review physicians. Rund objects to Hartford's reliance on the findings of Dr. Gitlow and Dr. Levy in making its initial determination on February 5, 2009. Specifically, Rund alleges that Hartford's determination was arbitrary and capricious in that it used the allegedly erroneous findings of its own doctors in light of the contrary findings of his own treating physicians.

Following Rund's notice of appeal, Rund submitted additional documentation, and Hartford concluded that additional peer reviews were necessary. MES Solutions retained Dr. Joseph Ricker, a licensed Clinical Neuropsychologist, and Dr. Ehpraim Brenman, a physician board certified in Physical and Rehabilitation Medicine, to conduct independent medical record peer reviews of Rund's medical records. (Defs.' 56.1 ¶¶ 462, 475.) Dr. Ricker concluded that no objective evidence was presented to support any ongoing psychological or cognitive disabilities. (*Id.* ¶ 474.) Dr. Brenman concluded that there was a lack of objective findings to support Rund's ongoing subjective symptoms of back and neck pain. (*Id.* ¶ 485.)

The Supreme Court has held that ERISA does not require a plan administrator to afford greater deference to the plaintiff's treating physician than that accorded to physicians retained by the administrator. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Hartford and the peer review physicians considered the evaluations of Rund's treating physicians but came to a different conclusion. This is not demonstrative of bias or arbitrary and capricious review.

### 2. Hartford's Vocational Consultants

Rund also takes issue with Hartford's reliance on the opinions of its in-house vocational consultants, Rehabilitation Case Manager Lisa Hufford and Team Leader Sharon Sullivan, instead of the Vocational Assessment of Amy Peiser–Leopold.

Hartford reviewed and referenced Ms. Peiser–Leopold's Vocational Assessment when the matter was referred to Sharon Sullivan for an updated EAR on December 11, 2009. In his memorandum, Rund noted "[i]n doing so, [MS. Sullivan] indicated her disagreement with Plaintiff's vocational expert, Ms. Leopold's opinion, which unequivocally supports a finding of disability." (Pl. Mem. at 21.) As a vocational expert, it was Ms. Peiser–Leopold's task to evaluate whether Rund's medically diagnosed functional limitations permit him to perform the essential duties of certain occupations, *not* to determine whether he is or is not disabled.

Additionally, Rund challenges Ms. Sullivan's EAR on the basis of her reliance on the restrictions/limitations identified by Dr. Ricker and Dr. Brenman. (*Id.*) As discussed above, it is not unreasonable to rely on independent peer medical reviews that are conducted by licensed physicians and based on a complete review of a claimant's medical file.

The Court finds that Rund's arguments do not support an inference that Hartford's reliance on the determinations of its own in-house vocational consultants was arbitrary and capricious.

### 3. SSA Determination

The Court of Appeals "encourage[d claims] administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusions." Hartford explained in its final determination precisely why its disability determination was different from that of the SSA. (Gatling Decl., Ex. B at 198.) Hartford wrote:

As stated, we note that your client has been approved for Social Security disability benefits. The Social Security Administration and The Hartford use different definitions of disability and different criteria for awarding disability benefits. A decision by The Hartford to award benefits does not mean that the Social Security Administration will award benefits, and vice versa.

(*Id.*) The SSA determination is not dispositive in Hartford's determination, as evidenced by the fact that Hartford initially awarded LTD benefits to Rund when the SSA denied them.

In *Metropolitan Life Insurance v. Glenn,* the Supreme Court stated "ERISA fiduciaries need not always reconcile their determinations with the SSA's, nor is the SSA's conclusion entitled to any special weight. The SSA's determination may have been wrong, and it was *contradicted* by other medical opinion." 554 U.S. 105, 134, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (internal citation omitted). This Court has held that claims administrators are only required not to ignore the SSA's determination. *Diamond v. Reliance Standard Life Ins. Co.,* 672 F.Supp.2d 530, 537 (S.D.N.Y.2009). Defendants certainly considered the determination of the SSA and explained to Plaintiff the different definitions and standards used. Accordingly, the Court does not find that Defendants acted in an arbitrary and capricious manner with respect to according weight to the SSA determination.

#### 4. Conflict of Interest

■ "[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weight as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.,*

551 F.3d 126, 133 (2d Cir.2008). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." *Id.*

■ A conflict of interest is but one of several factors a court should consider when reviewing a benefits denial. *Id.* The weight accorded to the conflict of interest varies dependent upon the record before the court. *Id.* The Court of Appeals recently held that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic v. Building Serv. 32 BJ Pension Fund,* 609 F.3d 133, 140 (2d Cir.2010) (citing *Hobson,* 574 F.3d at 83). Alternatively, " 'where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances,' the conflict should be accorded less weight, if any." *Schnur,* 2010 WL 1253481, at *11 (quoting *Metro. Life Ins.,* 554 U.S. at 117–18, 128 S.Ct. 2343).

Hartford engaged in appropriate "walling off" to minimize any potential conflict of interest. In her Declaration, Donna Gatling stated "[t]he decision to deny Rund's claim for LTD benefits was not motivated by self-interest or by a desire to avoid paying benefits." (Gatling Decl. ¶ 8.) Gatling also stated "[d]uring my review of Rund's denied claim on administrative appeal, I did not consider the financial impact of denying or approving his claim, or discuss that issue with anyone who works in Hartford's financial or underwriting departments." (*Id.* ¶ 11.) Gatling added, "[a]s an Appeals Specialist at Hartford, I did not receive any remuneration, bonus, award, recognition or other incentives to deny LTD claims." (*Id.* ¶ 12.) Gatling's Declaration supports that Hartford's claims administration division is "walled

off" from its financial and underwriting divisions.

Because there is no evidence that a conflict affected Hartford's denial of benefits and it engaged in appropriate "walling off," the Court accords no weight to this factor.

5. Rund's Remaining Arguments

■ Lastly, Rund argues that Hartford did not consider his subjective complaints of pain or his alleged hand and knuckle impairments. Hartford did consider Rund's subjective complaints of pain but concluded that there was no objective medical or psychological evidence demonstrating that the complaints of pain and cognitive difficulties prevented him from performing the essential duties of "Any Occupation."

■ " 'It has long been the law of this circuit that the subjective element of pain is an important factor to be considered in determining disability.'" *Hobson*, 574 F.3d 75, 88 (quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir.2001)). It is the claimant's burden to submit proof to demonstrate that his claimed disorder prevented him from working. *See Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869, at *11 (S.D.N.Y. Sept. 28, 2007). Here, Rund submitted documentation that he suffered from pain in his hand and knuckles but he failed to provide specific objective evidence as to how that impairment affects his functional capacity. (*See* Pl. Mem. at 18.) Hartford referred his records to Dr. Brenman who concluded that there was no evidence of any limitations/restrictions due to his purported hand and knuckle impairment. (Catling Decl., Ex. B at 310.) Rund did not meet his burden of demonstrating that his hand and knuckle pain prevented him from working. Hartford did consider Rund's subjective complaints, as noted throughout the record that Hartford re-

viewed in making its determinations. Accordingly, the Court rejects Rund's argument that Hartford turned a blind eye towards his subjective complaints of pain and hand and knuckle injuries.

III. Hartford's Counterclaim

■ Under section 502(a)(3) of ERISA, a plan fiduciary may bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or ... to obtain other appropriate *equitable relief* ... to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added). The Supreme Court has explained that equitable relief in this statute mean "mean[s] *something* less than *all* relief," and refers to "those categories of relief that were *typically* available in [courts of] equity." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209–10, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

■ When a fiduciary brings an action under Section 502(a)(3), he or she "must seek not to impose personal liability" on the Plan's beneficiary but rather must seek to restore "particular funds or property in the [beneficiary's] possession." *Id.* at 214, 122 S.Ct. 708. Otherwise, as the Court noted, such an action for restitution would seek a legal remedy not permitted by the plain text of section 502(a)(3).

Plaintiff asserts that Hartford has sought legal relief in their counterclaim. Plaintiff's theory is that because the particular funds paid to plaintiff by Hartford cannot be traced, Defendants cannot in good conscience identify the property in Plaintiff's possession which is to be returned. What the Defendants seek, in Plaintiff's view, is personal liability for the amount in question. Such a claim for re-

lief is not permissible under the ERISA statute.

However, the Supreme Court determined that the "inability to satisfy the 'strict tracing rules' for 'equitable restitution'" did not prevent a Plan's fiduciary from recovering overpayments. *Sereboff v. Mid Atl. Med. Servs., Inc.,* 547 U.S. 356, 365, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006). Furthermore, courts in this Circuit have similarly not required that the particular funds be identified in order for a fiduciary to enforce a reimbursement provision under ERISA. *See, e.g., Solomon v. Metro. Life Ins. Co.,* 628 F.Supp.2d 519, 534 (S.D.N.Y.2009) ("[T]he Plan fiduciary is entitled to relief in the form of a constructive trust on the overpayment *amount* specifically identified in the Plan, as distinct from [the insured's] general assets.").

In this case, Hartford is a fiduciary under the LTD Plan, and the Long Term Disability Options and Reimbursement Agreement provides for recoupment of excessive payments that were offset by payments made by a third party. Accordingly, Hartford properly brings this counterclaim to enforce the reimbursement provision.

## CONCLUSION

For the reasons state above, Defendants' motion for summary judgment [dkt. no. 19] is GRANTED, and Plaintiff's motion for summary judgment [dkt. no. 28] is accordingly DENIED.

SO ORDERED.